IN THE MATTER OF: DAVID HENRY ROGERS, APPLICANT TO THE 1975 BAR
EXAMINATION

No. 78

(Filed 20 April 1979)

1. Attorneys at Law § 2— applicant for admission to Bar—good moral
character—necessity for findings of fact

In cases in which all the essential facts either appear on the face of the
application for admission to the Bar or are otherwise indisputably established,
the Board of Law Examiners need only weigh the evidence and determine
whether the applicant has shown his good moral character. However, when a
decision of the Board of Law Examiners rests on a specific fact or facts the ex-
istence of which is contested, the Board must resolve the factual dispute by
specific findings of fact, and a mere recitation of the testimony heard by the
Board will not suffice.

2. Attorneys at Law § 2— applicant for admission to Bar—good moral
character—burden of proof—quantum of proof

An applicant for admission to the Bar has the burden of showing his good
moral character and, at the outset, must come forward with sufficient evidence
to make out a prima facie case. However, when an applicant does make a
prima facie showing of his good moral character and, to rebut the showing, the
Board of Law Examiners relies on specific acts of misconduct the commission
of which is denied by the applicant, the Board has the burden of proving the
specific acts by the greater weight of the evidence.

3. Attorneys at Law § 2— character defined

Character encompasses both a person's past behavior and the opinion of
members of his community arising from it.

4. Attorneys at Law § 2— review of findings of Board of Law Examiners—
"whole record" test

The "whole record" test is the proper scope of judicial review of findings
of the Board of Law Examiners.

5. Attorneys at Law § 2— denial of permission to take Bar Examination—moral
character—insufficient evidence

The Board of Law Examiners erred in denying an applicant permission to
stand for the N. C. Bar Examination on the ground that the applicant had
failed to demonstrate his good moral character where the Board attempted to
rebut the applicant's prima facie showing of good moral character by showing
that he had acted wrongfully in (1) altering an order form so as to have a clock
radio shipped to him but billed to another and (2) posing as another person in
an effort to cash a check drawn to the other person, but the record as a whole
did not contain substantial evidence to support findings, had they been made,
that the applicant committed either or both of these acts.

Chief Justice SHARP and Justices BRITT and BROCK did not participate in
the consideration or decision of this case.

ON appeal pursuant to Section .1405 of the Rules Governing Admission to the Practice of Law (hereinafter Rules) from a judgment entered by *Judge Giles Clark* on 26 April 1977 in WAKE Superior Court, affirming an order of the North Carolina Board of Law Examiners denying appellant permission to stand for the 1975 Bar Examination. Docketed and argued as No. 109 at the Fall Term 1977.

*Blanchard, Tucker, Twiggs & Denson, by Howard F. Twiggs and R. Paxton Badham, Jr., Attorneys for Appellant.*

*Fred P. Parker III, Attorney for the North Carolina Board of Law Examiners.*

EXUM, Justice.

Appellant David Henry Rogers is an applicant for admission to the North Carolina Bar. He was denied permission to stand for the 1975 Bar Examination by the Board of Law Examiners because of its decision that he had failed to demonstrate his good moral character. Upon consideration of the evidence as a whole, we conclude that it is insufficient to support the Board's determination. We therefore reverse the judgment of the superior court which affirmed the order.

Rogers filed application for admission to the Bar on 8 January 1975. His application was complete, including four "Certificates of Moral Character" signed by persons acquainted with him. Applicant appeared before the Bar Candidate Committee for the Tenth Judicial District which recommended that the Board find him to be of good moral character.

Rogers was subsequently twice summoned to appear before the Board for inquiry into his moral character. The first hearing was held on 12 June 1975. Five days later, the Board notified Rogers that he would be permitted to take the 1975 Bar Examination but that the results would be withheld pending further investigation. He took the examination. A second hearing was held on 5 February 1976. On 15 May 1976 the Board issued an order which in effect denied Rogers permission to be admitted to the bar because he failed to satisfy the Board "that he is possessed of good moral character and that he is entitled to the high regard and confidence of the public." On appeal to Wake Superior Court this order was affirmed.

Rogers' application showed that he was born in 1935 and was an honor graduate of the United States Military Academy in 1959. While he served as an officer in the United States Army from 1959 to 1968, he received numerous security clearances for access to the highest levels of classified information and was never denied any such clearance for which he applied. From 1968 to 1973 he worked as an insurance agent and commodity futures broker. He was licensed as an insurance agent and real estate broker by the State of North Carolina, as a mutual funds salesman by the National Association of Securities Dealers, and as a commodity futures broker by the Chicago Board of Trade. He entered the University of North Carolina School of Law in 1973 and graduated in just over two years while working part-time. He had no criminal record except for minor·traffic violations. No fact listed in his application was controverted.

Although some other matters were mentioned at the hearing, it is apparent that the Board's concern about Rogers' moral character was based on two incidents:

On 13 May 1974 an individual identifying himself as Nick DeMai opened a checking account at the Ridgewood office of First Citizens Bank & Trust Company in Raleigh by making a deposit of $50.00. Later that day the individual attempted to cash a check drawn to Nick DeMai in the amount of $234.14 at First Citizens' *Cameron Village* and *Westside* offices. The individual had no identification, and both offices refused to cash the check. Bank officials became suspicious and called Mr. DeMai, who stated that he had not opened an account with the bank. Later that day, an individual identifying himself as DeMai attempted to withdraw $50.00 from the bank's *downtown* office. While there, he was photographed by the bank's cameras. A postal inspector testified that DeMai rented Raleigh Post Office Box 18625 and Rogers, 18605 and that the two were next to each other. He also said he had investigated a lost check in the amount of $233.14 dated 10 May 1974 payable to Nick DeMai and supposedly mailed to DeMai at Post Office Box 18625 in Raleigh. The only witness who identified Rogers as the individual claiming to be DeMai was Mrs. Schoffner, manager of the Ridgewood office where the account had been opened. Mrs. Schoffner saw the individual for 15 to 20 minutes on 13 May 1974. She stated that she had not seen him again until the date of the hearing, 12 June 1975. When asked

how positive she was of her identification, she said she felt "pretty sure." In response to questions by Rogers, who was not then represented by counsel, she admitted she could be mistaken and that it could have been someone who looked like Rogers. She further stated she could not say that Rogers' voice was the same as the voice of the individual describing himself as DeMai, later clarifying this by saying she didn't recall if they were the same. She also identified several photographs as looking like the man who had posed as DeMai, but commented that "the hairline looked like the man that I remembered but the photograph looked younger than what I remember Mr. DeMai being."

The second incident involved a possible fraud in the use of a mail order form. Mr. John M. Roman, a postal inspector, testified that he had received a complaint from a Mr. Robert T. Bostrom that Bostrom's name had been forged on a mail order form. The order form was for a digital clock radio from the Union 76 Oil Company. On it Mr. Bostrom's post office box number, 19023, had been stricken through and been replaced with the number 1821; the zip code had been altered from 27609 to 27601; and Bostrom's signature was written at the bottom. Roman further stated that the radio was sent to Post Office Box 1821 in Raleigh in June, 1973, and that Rogers rented that box from 23 September 1968 to 30 June 1973. With regard to his investigation of this matter, Roman testified that he had gone to Rogers' house several times without finding him and had telephoned him and spoke to him once. He had made no other efforts to contact Rogers, had never seen him personally, had never shown him his identification as a postal inspector and had never asked him personally for information.

Rogers denied any involvement in either the DeMai or the Bostrom incidents.

He gave samples of his handwritten signature to the Board, but so far as the record reveals the Board made no comparison of them with the allegedly forged signatures. Rogers testified that he had handled money in a number of positions he had held and there had never been any complaint about his conduct. He further stated that he had no sudden need for money in May, 1974. He had an income at that time of about $650.00 per month from veteran benefits and part-time jobs. He had a credit rating which

made it possible for him to borrow money and had always been able to call on his father for financial assistance. He also testified and produced evidence that at the time of the hearing he was still a customer in good standing of both Union 76 and First Citizens Bank and had credit cards from both.

Fourteen witnesses, nine in person and five by affidavits, testified on Rogers' behalf and attested to his good character.

Colonel James F. Berry, a retired officer of the United States Air Force, testified that he had served as State Treasurer for Common Cause in North Carolina since 1972. During that time he had come to know Rogers, who then worked part-time as office manager of Common Cause. He stated that Common Cause kept about $300.00 on hand at all times and that Rogers handled this account as well as the account for fund raising. With regard to Rogers' character and honesty, he said, "He is of the finest character of anyone. . . . He is honest in every way. He has a fierce honesty, I think."

Mr. James P. Weaver testified that he was an automobile dealer and developer in the Raleigh area and had first met Rogers in 1959 when he sold him a car. He had also had contact with Rogers through prayer breakfasts which both attended. He stated that Rogers' character and reputation were excellent. In his experience, Rogers had been a good customer who paid his bills. He was also very impressed with the depth of Rogers' Christian faith.

Mr. William W. Coppedge testified that he was a licensed attorney serving as Deputy Secretary of State of North Carolina in charge of securities. Mr. Coppedge knew Rogers and had sought to have him employed with his department. He stated that Rogers was a very exceptional man in regard to honesty: "I think he is so honest that sometimes he may appear to be a little blunt to people." He recommended Rogers as a person fully qualified to practice law in North Carolina "without the slightest reservation."

Mr. Richard C. Titus, a Raleigh attorney, stated that he had known Rogers for several months, having met him at a business-men's prayer group. He had come to know Rogers further by virtue of their common membership in the Church of the Good

Shepherd. Mr. Titus stated that Rogers' general character and reputation were excellent as was his reputation for telling the truth and being honest. He recommended Rogers as a person fit and qualified to practice law "without question."

State Senator John W. Winters stated that he thought very highly of Rogers in regard to his general character and reputation. He added in respect to Rogers' honesty and reputation for telling the truth, "I would put my life on the line along with him."

Mr. Joseph J. Kalo, Mr. Arnold H. Loewy and Mr. Walker J. Blakey, all professors of law at the University of North Carolina, stated that they knew Rogers as a student. Each expressed a high opinion of Rogers' character and reputation. All three recommended his admission to the bar.

Mr. Robert W. Newsome III and Mr. Al Carlton stated that they had known Rogers as law school classmates. Both had a high opinion of Rogers in regard to his character and reputation. According to Mr. Newsome, Rogers' reputation was one of complete "frankness and honesty." He added that he would rate Rogers' reputation for honesty and telling the truth "at 100%." In his words, "He is the most honest and open individual I have ever met." Mr. Carlton's evaluation was similar. In his experience, he had never found Rogers to make a statement to him that was false. Both Mr. Newsome and Mr. Carlton recommended Rogers as a person fully qualified to practice law in North Carolina.

The Honorable Samuel P. Winborne, then a District Court Judge in the Tenth District, testified that he had come to know Rogers as a litigant in his court in a domestic case. He stated that in his opinion Rogers' general character and reputation were very good and that he "was very favorably impressed with him." Judge Winborne added that Rogers' regard for truth and honesty was "very high" and that it appeared to him that Rogers possessed the good moral character necessary for admission to the bar.

Mr. Jack P. Gulley, a Raleigh attorney, stated that he had represented Rogers' wife in an action against Rogers for child support. He said that in the negotiations he had found Rogers to be of high integrity and upstanding character.

Mr. Jacob W. Todd, a Raleigh attorney, stated by letter that Rogers had paid in full a $2,000.00 judgment against him by First and Merchants National Bank of Virginia. Mr. Todd added that he appreciated Rogers' attitude in the matter since he had made it known to Rogers that the Bank was willing to accept a sum substantially less than payment in full.

The Honorable Burley B. Mitchell, Jr., now a Judge of the North Carolina Court of Appeals, then District Attorney of the Tenth Prosecutorial District, stated by affidavit that he had offered Rogers a position as an Assistant District Attorney contingent upon his admission to the bar.

I

The Board of Law Examiners was created for the purpose of "examining applicants and providing rules and regulations for admission to the Bar." G.S. 84-24; *In re Willis*, 288 N.C. 1, 215 S.E. 2d 771, *appeal dismissed* 423 U.S. 976 (1975); *Baker v. Varser*, 240 N.C. 260, 82 S.E. 2d 90 (1954). The Board is authorized by G.S. 84-24 "to make or cause to be made such examinations and investigations as may be deemed by it necessary to satisfy it that the applicants for admission to the Bar possess the qualifications of character and general fitness requisite for an attorney and counselor-at-law." In connection with its investigations the Board may require applicants to appear before it to answer inquiries concerning their eligibility for admission to the bar. Rule .1201.[1]

The Board required Rogers to appear before it twice. The purpose of the hearings was to determine whether Rogers had met the requirements of Rule .0601:

"Every applicant shall have the burden of proving that he is possessed of good moral character and that he is entitled to the high regard and confidence of the public."

Had nothing else been shown Rogers' past record and the testimony of his character witnesses would have carried this burden overwhelmingly. The only evidence before the Board to the contrary was that concerning his possible involvement in the DeMai and Bostrom incidents.

---

1. The Rules Governing Admission to the Practice of Law have been promulgated by the Board and approved by this Court pursuant to G.S. 84-21. They have undergone some revision during the pendency of this action, but no provision bearing on the outcome here has been materially altered. All citations are to the rules as published by the Board on 23 August 1977.

In re Rogers

The Board made no finding of fact that Rogers was involved in either incident. Indeed it made no findings of fact at all. It merely recited some of the evidence presented and stated its conclusion that Rogers had not satisfied the Board of his good moral character. For example, Mrs. Schoffner was the key witness whose testimony might have shown that Rogers was the person posing as DeMai. At one point she said Rogers was the impostor; later, however, she admitted that she might have been mistaken. The Board did not pass on the credibility of her testimony. It merely noted that she "identified David Henry Rogers as the individual who appeared before her on May 13, 1974 representing himself as Nick DeMai." It made no finding based on her or anyone else's testimony that Rogers was indeed the person who posed as Nick DeMai.

The Board argues that it is not required to make findings of fact but need only make the ultimate determination whether an applicant has carried his burden of showing good moral character. The procedure suggested by the Board may be acceptable in cases in which there is no dispute as to the underlying facts. This seems to have been the posture of all previous cases cited by the parties.

Applicant in *In re Dillingham*, 188 N.C. 162, 124 S.E. 130 (1924), was accused by protestants of obtaining goods by false pretense, larceny, or conspiracy to commit it, forgery, extortion and other conduct involving moral turpitude. Applicant made no substantial denial of the charges but attempted to show that there was an excuse for his prior conduct and that at the time of his application he was a person of good character. There was thus before the Court only the question whether applicant had shown his good moral character; none of the facts underlying this determination were in dispute. In *In re Applicants for License*, 191 N.C. 235, 131 S.E. 661 (1926), there were some factual disputes, but the principal questions before the Court were whether the acts complained of were evidence of bad moral character and, if so, whether the applicants had shown sufficient improvement in their character. And in *In re Willis, supra*, 288 N.C. 1, 215 S.E. 2d 771, the question was whether the conclusion that the applicant had not shown his good moral character was supported by the undisputed facts before the Board.

[1] In cases in which all the essential facts either appear on the face of the application or are otherwise indisputably established, the Board need only weigh the evidence and determine whether the applicant has shown his good moral character. In the words of Mr. Justice Frankfurther, concurring in *Schware v. Board of Bar Examiners*, 353 U.S. 232, 248 (1957), *quoted in In re Willis, supra,* 288 N.C. at 19, 215 S.E. 2d at 782:

> "[S]atisfaction of the requirement of moral character involves an exercise of delicate judgment on the part of those who reach a conclusion, having heard and seen the applicant for admission, a judgment of which it may be said . . . that it expresses 'an intuition of experience which outruns analysis and sums up many unnamed and tangled impressions; impressions which may lie beneath consciousness without losing their worth.' "

Even in such cases, while it might be permissible for the Board not to make specific findings of fact, a detailing of the facts on which it bases its conclusions would facilitate judicial review as it did in *In re Willis, supra.*

This case is different from those just discussed in that the only facts which could support a conclusion that Rogers did not show good moral character are in sharp dispute. The Board had before it accusations which Rogers totally and unequivocally denied and which had never before been tested by any other tribunal. In such a case the Board must necessarily serve as the adjudicator of the facts in dispute and must ultimately find with regard to them what it believes the truth to be. Mere recitation of the testimony heard by the Board will not suffice. Administrative agencies must find facts when factual issues are presented. They cannot fulfill this duty by merely summarizing the evidence. *Thomason v. Cab Co.*, 235 N.C. 602, 70 S.E. 2d 706 (1952); *see also Commissioner of Insurance v. Automobile Rate Office*, 293 N.C. 365, 388-91, 239 S.E. 2d 48, 63-64 (1977); *Taylor v. Dickson*, 251 N.C. 304, 111 S.E. 2d 181 (1959). Cases from other jurisdictions supporting these propositions include *American Transport Co. v. Public Service Commission*, 239 Ind. 453, 154 N.E. 2d 512 (1958); *Weston v. New Jersey State Board of Optometrists*, 32 N.J. Super. 502, 108 A. 2d 632 (1954); *Valley and Siletz R.R. Co. v. Flagg*, 195 Or. 683, 247 P. 2d 639 (1952). When a

decision of the Board of Law Examiners rests on a specific fact or facts the existence of which is contested, the Board's duty to resolve the factual dispute by specific findings is no less than that of other administrative agencies.

Indeed the rules under which the Board operates clearly contemplate that it make findings of fact when necessary. Rule .1404 speaks of the manner in which "findings of fact by the Board" shall be reviewed by the Superior Court. The exercise of the Board's fact-finding function is illustrated in *Baker v. Varser, supra*, 240 N.C. 260, 82 S.E. 2d 90, a dispute over whether an applicant had established his residency, in which the Board made extensive findings. Furthermore, under G.S. 84-24 the Board is the primary investigatory and fact-finding agency in the bar admissions process. When factual disputes are fairly brought before it, it must resolve them. No other agency exists to make such resolutions.

[2] Moreover, when an applicant makes a prima facie showing of his good moral character and, to rebut the showing, the Board relies on specific acts of misconduct the commission of which is denied by the applicant, the Board must assume the burden of proving the specific acts by the greater weight of the evidence. The rule that applicant has the overall burden to prove his good moral character does not relieve the Board from having to prove such specific acts of misconduct. To place the burden on the applicant to disprove such acts would be a distortion of the intended effect of the rule requiring the applicant to prove, overall, his good character. In order to avoid this distortion it is necessary to distinguish between applicant's overall burden of showing good moral character and the Board's burden of proving particular instances of misconduct. A general procedure is suggested by the United States Supreme Court in *Konigsberg v. State Bar of California*, 366 U.S. 36, 41 (1961):

> "[A]n applicant must initially furnish enough evidence of good character to make a prima facie case. The examining Committee then has the opportunity to rebut that showing with evidence of bad character."

*Accord Martin-Trigona v. Underwood*, 529 F. 2d 33 (7th Cir. 1975); *State v. Poyntz*, 152 Or. 592, 52 P. 2d 1141 (1935).

[3] Whether a person is of good moral character is seldom subject to proof by reference to one or two incidents. In the words of Chief Justice Stacy in *In re Applicants for License, supra*, 191 N.C. at 238, 131 S.E. at 663:

> "[Good moral character] is something more than the absence of bad character. It is the good name which the applicant has acquired, or should have acquired, through association with his fellows. It means that he must have conducted himself as a man of upright character ordinarily would, should or does. Such character expresses itself, not in negatives nor in following the line of least resistance, but quite often in the will to do the unpleasant thing, if it is right, and the resolve not to do the pleasant thing, if it is wrong."

Character thus encompasses both a person's past behavior and the opinion of members of his community arising from it. Were it not for the requirement that each applicant marshal evidence of his own good moral character, an insurmountable investigatory burden would be placed on the Board. Nor in most cases is it a particular hardship for the applicant to have to bear this burden. "Facts relevant to the proof of [an applicant's] good moral character are largely within the knowledge of the applicant and are more accessible to him than to an investigative board. Accordingly, the burden of proving his good moral character traditionally has been placed upon the applicant in this State and in other jurisdictions." *In re Willis, supra*, 288 N.C. at 15, 215 S.E. 2d at 780.

This rationale does not apply, however, when an investigation is narrowed to one or two incidents of alleged misconduct of the applicant. Here, for example, Rogers stands accused of two acts of fraudulent conduct. His access to information concerning these transactions is not superior to that of the Board. Indeed, taking into account the superior investigatory resources of the Board, it is reasonable to assume the contrary. An application for admission to the bar may not be denied on the basis of suspicions or accusations alone. *Coleman v. Watts*, 81 So. 2d 650 (Fla. 1955); *In re Crum*, 103 Or. 296, 204 P. 948 (1922). Yet if there is not some reallocation of the burden of proof in these circumstances precisely this may happen. An applicant may be able to meet a charge of wrongdoing only with his denial. If the Board is not required to

prove that which applicant denies the result might be that the application is refused on the basis of a mere accusation.

It could be argued that such an extreme situation might be avoided by simply requiring the Board to come forward with some substantial evidence to support its charges. We think such an approach should be rejected for two reasons. First, it is not in accord with sound administrative procedure to allow something to be found as a fact when it is not supported at least by the greater weight of the evidence:

> "It is a commonplace that in a given case the evidence may support a finding either way. . . . The factfinder must make a choice based on his own appreciation of the greater probability . . . the factfinder should believe that the fact is 'true,' rather than merely make an objective judgment of its probability." Jaffe, Administrative Law: Burden of Proof and Scope of Review, 79 Harv. L. Rev. 914, 915 (1966).

Second, such a procedure would be in conflict with our usual civil practice on assignment of burden of proof. As a general rule in this jurisdiction, the party who substantively asserts the affirmative of an issue bears the burden of proof on it. *King v. Bass*, 273 N.C. 353, 160 S.E. 2d 97 (1968); 2 Stansbury's North Carolina Evidence § 208 (Brandis rev. 1973) (hereinafter Stansbury). The rationale for this rule lies in the inherent difficulty of proving the negative of any proposition. It is reflected in the Rules under which the Board operates. The applicant for admission to the bar asserts his good moral character. The burden is on him to prove it. When the Board attempts to rebut his proof by showing some particular adverse fact, it should bear the burden of proving that fact. The normal burden of proof in civil cases is by the preponderance, or greater weight, of the evidence. *Speas v. Bank*, 188 N.C. 524, 125 S.E. 398 (1924). It should suffice for the Board to make its findings on that basis.

In summary, an applicant for admission to the bar has the burden of showing his good moral character. At the outset, he must come forward with sufficient evidence to make out a prima facie case. The Board, or any other person wishing to contest an application, may then offer rebuttal evidence. If there are material factual disputes, the Board must resolve them by making findings of fact. If the disputes arise out of charges initially made

before the Board, the Board must determine whether the charges have been proved by a preponderance of the evidence before it can rely on them in concluding that an applicant has not shown his good moral character.

Here Rogers made out a prima facie case. The Board offered evidence tending to show that he had committed two wrongful acts. Rogers denied committing the acts. The Board could have found that Rogers had not shown his good moral character only if it believed he had done these acts. There was thus a genuine dispute as to the crucial facts. It was error for the Board, as a prerequisite to denying Rogers' application, to fail to find by the greater weight of the evidence, the burden of proof being upon the Board, that Rogers did commit either or both of these acts.

## II

Normally, remand is the proper course when an administrative body has failed to make necessary findings of fact. *Commissioner of Insurance v. Automobile Rate Office, supra,* 293 N.C. 365, 239 S.E. 2d 48. It is also clearly established, however, that when an agency does make findings of fact an order based on them may be reversed by a reviewing court when they are not supported by the evidence. *Underwood v. Board of Alcoholic Control,* 278 N.C. 623, 181 S.E. 2d 1 (1971). Appellant Rogers urges us to consider at this juncture whether had the Board made the required findings here, such findings would have been supported by the evidence. He argues that the evidence in the record is insufficient to support any finding on which a conclusion that he had not shown his good moral character could be based, and he asks us to order him admitted to the bar if he made a passing score on the 1975 examination.

We note that courts elsewhere, even after determining that an error justifying remand had occurred, have proceeded to examine the record to see if there would have been sufficient evidence to support necessary findings if they had been properly made. *See, e.g., Gardner v. Smith,* 368 F. 2d 77 (5th Cir. 1966). The hearing and appeals processes here have been lengthy. The matter in question touches on appellant's right to earn his livelihood by practicing his chosen profession. Considering the circumstances of the case and the merits of appellant's argument, we think it appropriate for us to undertake the review he suggests.

As already noted the Board could have properly concluded that Rogers had not shown his good moral character only if it had found that Rogers acted wrongfully either in (1) altering an order form so as to have a clock radio shipped to him but billed to Robert Bostrom or (2) posing as Nick DeMai in an attempt to cash a check drawn to DeMai. The question before us, then, is whether there was sufficient evidence in the record to have supported either or both of these findings had they been made.

[4] To answer this we need first decide the appropriate scope of judicial review of a finding of the Board of Law Examiners. Appellant urges us to adopt the "whole record" test for this purpose. The Board argues instead that its findings must be upheld if supported by "any competent evidence."

Judicial review of the sufficiency of evidence supporting administrative decisions has generally been under one of three standards in North Carolina: de novo review; a "substantial evidence on the whole record" test; or an "any competent evidence" test. *Thompson v. Board of Education*, 292 N.C. 406, 233 S.E. 2d 538 (1977); Hanft, Some Aspects of Evidence in Adjudications by Administrative Agencies in North Carolina, 49 N.C. L. Rev. 635, 666-74 (1971). De novo review is seldom applied in the absence of an express statutory provision. *E.g., In re Dillingham*, 257 N.C. 684, 127 S.E. 2d 584 (1962). It is clearly neither contemplated nor warranted here.

We are thus left with a choice between the two tests urged by the parties. The language of Rule .1404 is not determinative:

"The findings of fact by the board, when supported by competent evidence, shall be conclusive and binding upon the court."

The emphatic word "any" does not modify "competent evidence." *Compare* G.S. 96-4(m) (findings by the Employment Security Commission conclusive on questions of fact when "supported by *any* competent evidence"). It is true that the word "evidence," when its meaning is not otherwise clarified, has been read as "substantial evidence." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Washington, Va. & Md. Coach Co. v. NLRB*, 301 U.S. 142, 146-47 (1937). There is, however, no reference to evidence "on the whole record" or "on the entire record as submitted." We

must therefore go beyond the language of the Rule to resolve the question presented.

In our two previous cases from the Board of Law Examiners, *In re Willis, supra,* 288 N.C. 1, 215 S.E. 2d 771, and *Baker v. Varser, supra,* 240 N.C. 260, 82 S.E. 2d 90, the question of the proper scope of judicial review was not presented. *Baker v. Varser* merely restated the formulation of the Rules. In *In re Willis,* however, the following statements appear:

> "As long as there is evidence in the record which *rationally justifies* a finding that the applicant has failed to establish his moral fitness to practice law, this Court cannot substitute its judgment for that of the Board of Law Examiners."

and

> "When the Board's findings of fact and conclusions of law are viewed *in the context of the entire record as submitted,* we conclude that they are rationally justified by the evidence." 288 N.C. at 16, 19, 215 S.E. 2d at 780, 782. (Emphasis supplied.)

When read together, these two statements strongly support adoption of the "whole record" standard. The second statement clearly indicates that the Court applied the "whole record" test in making its decision. Nor is the first statement inconsistent with such an application, for as one of the leading commentators on judicial review has explained:

> "Judicial review is designed . . . to provide minimum assurance that there is record evidence which provides a rational or logical basis for the finding and for the consequent presumption that the finding was in fact the product of reasoning from evidence. This must mean evidence in the case and in the context of the case. To abstract out of a case that part of the evidence which can be made to support a conclusion is to imagine an abstract case, a case that was never tried. A conclusion based on such abstracted evidence may be 'rational,' *but it is not a rational decision of the case which was tried.*" Jaffe, Judicial Control of Administrative Action 601 (1965).

In re Rogers

Thus to the extent our decisions have spoken on the issue of judicial review of findings by the Board, they have favored the "whole record" test.

In addition to the language from *In re Willis*, we find strong support for the "whole record" test in the public policy of the state as expressed in its General Statutes.[2]

Chapter 150 of the General Statutes, effective at the time this proceeding began, was captioned "Uniform Revocation of Licenses." It dealt with various licensing boards and set out procedures for granting and revoking licenses. It covered, for example, boards having to do with barbers, chiropractors, contractors, engineers and land surveyors, nurses, opticians, optometrists, vetenarians, dentists, psychologists and landscape architects.[3] G.S. 150-27 provided for the scope of judicial review of actions by these boards and provided that an agency decision could be reversed or modified by the courts if, among other grounds, it were "unsupported by competent, material and substantial evidence *in view of the entire record as submitted.*" (Emphasis supplied.)

Likewise at the time this proceeding began, Article 33 of Chapter 143 of the General Statutes controlled judicial review of administrative agencies in general. G.S. 143-306 defined "administrative agency" to mean "any State officer, committee, authority, board, bureau, commission, or department authorized by law to make administrative decisions, except those agencies in the legislative or judicial branches of government, and except those whose procedures are governed by Chapter 150 of the General Statutes, or whose administrative decisions are made subject to judicial review under some other statute or statutes containing adequate procedural provisions therefor." Under G.S. 143-315(5) a decision of an administrative agency could be reversed or modified by a reviewing court if "unsupported by competent, material and substantial evidence *in view of the entire record as submitted.*" (Emphasis supplied.)

---

2. For a compelling argument urging the use of statutory policies in decisional law, see Traynor, Statutes Revolving in Common Law Orbits, 17 Cath. U.L. Rev. 401 (1968).

3. Among the few notable exceptions from the coverage of this Chapter were the Board of Law Examiners and the Board of Medical Examiners. Procedures before the Board of Medical Examiners are separately set out in Chapter 90 of the General Statutes. G.S. 90-14.1 makes clear that decisions of the Board of Medical Examiners are to be upheld unless "not supported by any evidence admissible under this Article [Article I of Chapter 90]."

Both Chapter 150 and Article 33 of Chapter 143 were repealed effective 1 February 1976 and replaced by Chapter 150A, the new Administrative Procedure Act. *See* Session Laws 1973, Ch. 1331, as amended by Session Laws 1975, Ch. 69. While the new Act introduced many new features in administrative procedure in North Carolina, *see generally*, Daye, North Carolina's New Administrative Procedure Act: An Interpretive Analysis, 53 N.C. L. Rev. 833 (1975), it left the scope of judicial review unchanged. G.S. 150A-51 reads, in pertinent part:

> "The court . . . may reverse or modify the [agency] decision if the substantial rights of the petitioners may have been prejudiced because the agency findings, inferences, conclusions, or decisions are:
>
>     . . . .
>
>     (5) Unsupported by substantial evidence admissible under G.S. 150A-29(a) or G.S. 150A-30 *in view of the entire record as submitted* . . . ." (Emphasis supplied.)

It is thus clear that with few exceptions judicial review of administrative decisions in North Carolina is under the "whole record" test.[4]

While neither Chapter 150,[5] Article 33 of Chapter 143, nor the Administrative Procedure Act[6] apply generally to this proceeding, the policy which all these statutes reflect favoring the "whole record" test for judicial review of administrative proceedings helps persuade us to apply that test here in the absence of a clear statement to the contrary in the Board's rules.

[4] The rules of the Board express no real preference for one type of judicial review of findings as against another. *In re Willis*, *supra*, 288 N.C. 1, 215 S.E. 2d 771, gave implicit approval to the "whole record" test. That test has been endorsed by the General

---

4. Among the exceptions are the Employment Security Commission and the Board of Medical Examiners, for which the "any competent evidence" test is provided, and the Industrial Commission, for which the standard of review is not set out in the statute. *See* G.S. 150A-1, G.S. §§ 96-4(m), 90-14.1 and 97-86. *But see* G.S. 62-94(b)(5) ("whole record" test applies to review of decisions of Utilities Commission).

5. See note 3, *supra*.

6. The act provides that it "shall not affect any pending administrative hearings." 1973 Session Laws, Ch. 1331, § 4. This hearing was pending on the Act's effective date of 1 February 1976. Whether the act will in the future apply to proceedings of the Board is a question we do not now address.

Assembly as the principal method of judicial review of administrative findings in this state. The "whole record" test is not a tool of judicial intrusion; instead, it merely gives a reviewing court the capability to determine whether an administrative decision has a rational basis in the evidence. *See* Jaffe, Judicial Control of Administrative Action, *supra,* at 601; Daye, *supra,* at 920-921. We therefore adopt the "whole record" test as the proper scope of judicial review of findings of the Board of Law Examiners.

Application of the "whole record" test is illustrated in *Thompson v. Board of Education, supra,* 292 N.C. 406, 233 S.E. 2d 538. Plaintiff in *Thompson,* a teacher in Wake County, was dismissed from his position on grounds of immorality, insubordination, neglect of duty and mental incapacity. The dismissal was reversed by the superior court because of insufficient evidence to support the Board of Education's findings. The Court of Appeals reversed and reinstated the order of dismissal, finding, however, that the evidence supported at most the charge of neglect of duty. We in turn reversed the Court of Appeals, holding "the evidence that Mr. Thompson neglected his duty to maintain order and discipline [to be] insubstantial in view of the entire record." *Id.* at 415, 233 S.E. 2d at 544. Justice Copeland, writing for the Court, explained the application of the "whole record" test, *id.* at 410, 233 S.E. 2d at 541:

> "The 'whole record' test does not allow the reviewing court to replace the Board's judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it *de novo.* On the other hand, the 'whole record' rule requires the court, in determining the substantiality of evidence supporting the Board's decision to take into account whatever in the record fairly detracts from the weight of the Board's evidence. Under [this] rule, the court may not consider the evidence which in and of itself justifies the Board's result, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." (Citations omitted.)

[5] Upon reviewing the entire record here with these considerations in mind, we conclude there is not substantial evidence to

support a finding that Rogers acted wrongfully in either (1) altering an order form so as to have a clock radio shipped to him but billed to Robert Bostrom or (2) posing as Nick DeMai in an effort to cash a check drawn to DeMai.

On the first point, the testimony was that the post office box number and the zip code on a Union 76 order form had been altered so that a clock radio would be sent to a box rented by Rogers. Mr. Robert T. Bostrom's signature was written in on the bottom of the form. The radio was sent out sometime in June, 1973. Rogers discontinued renting the box in question on 30 June 1973. There was no evidence he received the radio at that box. Mr. Roman, who investigated the matter, spoke to Rogers once. He never asked Rogers for information about the incident. He had apparently simply dropped the matter after their one conversation. No charges were ever brought against Rogers and he remained at the time of the hearing a credit card customer in good standing of Union 76. Giving due weight to all these circumstances, we cannot say that there is substantial evidence that Rogers acted wrongfully in this matter.

With regard to the second point, it is clear that someone posed as Nick DeMai in an attempt to cash a check on 13 May 1974. The question we must answer is whether there is substantial evidence that that person was Rogers.

The only testimony that could supply a positive answer to this question was given by Mrs. Schoffner. She saw the individual for 15 to 20 minutes on 13 May 1974. Her first reaction at the hearing on 12 June 1975, over a year later, was that Rogers was the individual. Shortly thereafter, she admitted she could have been mistaken and that it may have only been someone who looked like Rogers. She could not recall if Rogers' voice was similar to the voice of the person identifying himself as DeMai. And in identifying photographs as looking like the man who had posed as DeMai, she commented that "the hairline looked like the man that I remembered but the photograph looked younger than what I remember Mr. DeMai being."

Mrs. Schoffner's opportunity to observe the person posing as DeMai took place before she had any suspicions about his conduct. Nothing in the record indicates she paid any special attention to the person while he was in her presence. Over a year passed

In re Rogers

before the hearing at which she was asked to identify this person. Even under the circumstances of the hearing, to which she had been summoned to identify a specific person and at which only Rogers was present to be identified, she admitted considerable uncertainty.[7] We cannot say that by itself Mrs. Schoffner's testimony was substantial evidence that Rogers was the person who posed as DeMai.

There are in the record photographs which might have bolstered Mrs. Schoffner's testimony. Because of the way they were used, however, we cannot give any weight to them. There was testimony that these photographs were taken when "DeMai" attempted to withdraw $50.00 at the bank's *downtown* office. Mrs. Schoffner was at the *Ridgewood* office. No witness testified that these photographs accurately depicted the person posing as DeMai as he stood at the bank counter; nor were the photographs otherwise authenticated. Authentication is, of course, a prerequisite for the admission of photographs into evidence. *State v. Dawson*, 278 N.C. 351, 180 S.E. 2d 140 (1971); 1 Stansbury, *supra*, § 34.. Moreover, even with proper authentication, photographs may only be used for illustrative purposes. *State v. Foster*, 284 N.C. 259, 200 S.E. 2d 782 (1973); *State v. Tew*, 234 N.C. 612, 68 S.E. 2d 291 (1951); *see* 1 Stansbury, *supra*, § 34. These photographs were not used to illustrate anyone's testimony.

Neither so far as the record reveals did the Board determine that these photographs depicted Rogers. Instead nine witnesses were asked whether they thought the photographs depicted Rogers.[8] The Board thus asked for clearly incompetent opinion testimony since the witnesses were in no better position than the Board to say who was represented in the photographs. *See State v. Wilkerson*, 295 N.C. 559, 247 S.E. 2d 905 (1978). For the reasons stated, no weight can be given the photographs in determining whether Rogers was the person posing as DeMai. Since we have already stated that Mrs. Schoffner's testimony alone will not suffice, we hold that there is not substantial evidence in the record as a whole to support such a finding.

---

7. Although some of the qualifications Mrs. Schoffner placed on her testimony were in response to questions by Rogers, we think it appropriate to note that she was not subjected to cross-examination by counsel. Rogers had waived counsel at the beginning of the hearing before he was fully informed of the nature of the charges against him.

8. Of the nine, only one thought the photographs depicted Rogers. Three thought the photographs did not depict Rogers. Five were unable to give an opinion.

While the matters presented before the Board aroused suspicions that perhaps Rogers had been engaged in wrongdoing, we have, in the end, nothing more than that. Arrayed against these suspicions is Rogers' impressive record. He served with distinction in the United States Army, rising to the rank of major and receiving the Bronze Star and the Air Medal. He had been given numerous high level security clearances. After leaving the army, he worked for five years in jobs in which he handled large sums of money. He graduaged high in his law school class while working part-time and completed the normal three-year curriculum in two years. In all his prior dealings, no question of his honesty had ever been raised. Fourteen character witnesses appeared on his behalf. Those who knew him best seemed especially impressed by his honesty and integrity.

In these circumstances, we are reminded of the words of Mr. Justice Black in *Konigsberg v. State Bar of California*, 353 U.S. 252, 273-74 (1957): "A lifetime of good citizenship is worth very little if it is so frail that it cannot withstand the suspicions which apparently were the basis for the Committee's action." So it is here.

The judgment of the superior court affirming the order of the Board of Law Examiners is reversed and the case remanded to the superior court with instructions that it be further remanded to the Board of Law Examiners. If Rogers made a passing grade on the 1975 Bar Examinations, the Board of Law Examiners is directed to issue him a license to practice law in this state.

Reversed and remanded.

Chief Justice SHARP and Justices BRITT and BROCK did not participate in the consideration or decision of this case.