STATE OF NORTH CAROLINA v. RICHARD BENBOW

No. 136A83

(Filed 3 November 1983)

**1. Criminal Law § 138— pecuniary gain aggravating factor**

Where the record does not support a finding that the defendant was hired or paid to commit the offense, the trial judge erred in relying on the aggravating factor that the offense was committed for pecuniary gain.

**2. Criminal Law § 138— especially heinous, atrocious, or cruel aggravating factor**

The trial court properly found as an aggravating factor that a second degree murder was especially heinous, atrocious, or cruel where the evidence tended to show that the victim's skull was crushed and fractured in several places, the orb of one eye was driven into the brain, and the victim lingered and remained in a semiconscious state for over twelve hours.

**3. Criminal Law § 138— mitigating circumstances—mental condition reducing culpability—inability to see serious harm resulting from conduct—insufficient evidence**

Evidence that defendant would not understand that his role as a lookout in an armed robbery could result in his personal responsibility for the re-

State v. Benbow

sulting brutal murder of the robbery victim did not require the trial court to find as a mitigating factor under G.S. 15A-1340.4(a)(2)d that defendant was suffering from a mental condition sufficient to reduce his culpability for the crime. Nor did such evidence require the trial court to find as a mitigating factor under G.S. 15A-1340.4(a)(2)j that defendant could not reasonably have foreseen that his conduct could cause or threaten serious harm, since the test is not whether defendant subjectively believes or does not believe but whether he could reasonably foresee that his conduct would cause harm.

**4. Criminal Law § 138— passive participant in offense as mitigating factor**

In imposing a sentence for second degree murder of an armed robbery victim, the trial court should have considered whether defendant met his burden of proving by a preponderance of the evidence the mitigating factor that he was only a passive participant in the actual murder where there was evidence tending to show that, although defendant played an active role in the planning and execution of the robbery, he acted only as a lookout, was not present, and did not participate in the actual bludgeoning of the victim, since it is proper at sentencing to consider defendant's actual role in the offense as opposed to his legal liability for the acts of others.

**5. Criminal Law § 138— sentencing hearing—evidence of good character**

When the defendant in his sentencing hearing produces evidence of his good character in order to take advantage of that particular mitigating circumstance, G.S. 15A-1340.4(a)(2)m, character is "a direct issue in the case" and thus is not limited to the traditional methods of proof but may be proved by specific acts as well as by reputation and by the opinions of others.

**6. Criminal Law § 138— good character or good reputation as mitigating factor—insufficient proof**

Evidence that defendant was a young man who, apart from one incident with the law for which he appeared to have been making satisfactory amends, was generally well-behaved, considerate, respectful to family and friends, truthful, and good to his mother, and that he attended church regularly as a youth did not rise to the level which would entitle defendant to a finding in mitigation that he was a person of "good character" or that he had a "good reputation." Furthermore, because defendant's character witnesses were, for the most part, family members, their relationship with defendant was a factor in assessing the credibility of these witnesses, and it was therefore within the trial court's prerogative to accept or reject their testimony.

**7. Criminal Law § 138— sentencing hearing—reliance on evidence from trials of others**

At any sentencing hearing held pursuant to a plea of guilty, reliance on evidence from the trials of others connected with the same offense is improper absent a stipulation. Even with such a stipulation, reliance exclusively on such record evidence from other trials (in which the defendant being sentenced had no opportunity to examine the witnesses) as a basis for a finding of an aggravating circumstance may constitute prejudicial error, since the focus in such other trials is necessarily upon the culpability of others and not on the culpability of the defendant being sentenced. Thus, by proper stipulation and

in the interest of judicial economy, the sentencing judge may consider the evidence from such other trials, but only as incidental to his present determination of defendant's individual culpability as a factor in sentencing.

BEFORE *Stevens, J.,* at the 13 October 1982 Session of Superior Court, NEW HANOVER County, defendant was sentenced to life imprisonment upon his plea of second degree murder. He appeals pursuant to N.C. Rule of App. P. 4(d), as authorized by G.S. § 15A-1444(al) & (d) (Cum. Supp. 1981). Heard in the Supreme Court 6 October 1983.

Freddy Stokes, Lorenzo Thomas, James Murray and the defendant were indicted for the murder of Kauno A. Lehto. Judge Stevens presided at the trial of Freddy Stokes in May 1982, and at the trial of James Murray in September-October 1982. Prior to the trial of James Murray, the defendant agreed to testify for the State in return for acceptance of a plea to second degree murder. Lorenzo Thomas testified for the State at both trials. Following a total of eight weeks of trial testimony in the Stokes and Murray trials, Judge Stevens sentenced both Thomas and Benbow.

At a sentencing hearing held pursuant to G.S. § 15A-1340.1 through -1340.4 the following facts, inter alia, were stipulated by the defendant and the State as an accurate narration of the events leading up to the death of Kauno A. Lehto and defendant's subsequent plea to second degree murder:

During the late evening of December 28, 1981, defendant RICHARD BENBOW and co-defendants LORENZO THOMAS, FREDDY STOKES, and JAMES MURRAY met in the playground area of the Houston-Moore housing project in the City of Wilmington and there agreed among themselves to go to the Wilmington Bonded Warehouse, located approximately three blocks away, to rob the owner, KAUNO A. LEHTO, age 70. FREDDY STOKES and JAMES MURRAY each carried a stick approximately 18″ long and one to two inches in diameter. The four men walked to the Wilmington Bonded Warehouse at 13th and Kidder Streets just as darkness fell. Once at the warehouse, a concrete building office annex, which is entered by a 25 foot ramp leading from the ground to the office door, the defendants positioned themselves to wait for the owner to emerge. Defendants STOKES and MURRAY positioned themselves on either side of the doorway, defendant BENBOW

stood at the foot of the ramp, approximately 25 feet away, acting as a lookout. Co-defendant LORENZO THOMAS was across 13th Street, approximately 258 feet, also acting as a lookout.

KAUNO A. LEHTO, age 70 emerged from his business sometime between 6:05 P.M. and 6:15 P.M. on the night of December 28, 1981. He was carrying a briefcase and an armload of other papers. Night had fallen and rain and fog prevailed during the period of the 28th. LEHTO emerged from the door of the office building and was beaten repeatedly by MURRAY and STOKES with sticks. The beating occurred partway down the ramp, within 25 feet of defendant BENBOW. Co-defendants MURRAY and STOKES then robbed the semi-conscious LEHTO of his wallets, money amounting to approximately $250, briefcase and keys and then ran down the ramp to where defendant BENBOW was waiting.

Once at the foot of the ramp all three defendants — STOKES, MURRAY and BENBOW — entered the victim's car and drove off using the victim's stolen keys to operate the car, leaving co-defendant LORENZO THOMAS behind. BENBOW, MURRAY and STOKES then rode around Wilmington in the victim's car, later abandoning it one block from the Houston-Moore housing project where they all lived or stayed from time to time.

The victim, a man of 70 years of age, was left on the concrete ramp of the warehouse building from approximately 6:15 P.M. until about 8:15 when he was found semi-conscious by family friends who searched for him when he failed to come home after work.

LEHTO was taken to New Hanover Memorial Hospital by ambulance where he was admitted into Intensive Care. He lived in a semi-conscious state until 8:30 A.M. the following day, December 29, 1981.

The doctors who treated the victim stated that he died of multiple blunt trauma wounds and that the cause of death was massive cerebral injury. The skull was crushed and fractured in several places and the orb of one eye was driven into the brain. The victim lost massive amounts of blood due

to his injuries. The victim attempted to communicate with others around him but his words were unintelligible.

The case remained unsolved until the end of January 1982 when LORENZO THOMAS gave a voluntary statement implicating himself and co-defendants STOKES, MURRAY and BENBOW. Based on the information provided by THOMAS; BENBOW, MURRAY and STOKES were arrested and questioned. STOKES and BENBOW gave voluntary statements when confronted with THOMAS' statement.

Prior to trial, LORENZO THOMAS agreed to testify for the State without any plea bargain or plea agreement. Separate trials were ordered and on May 18, 1982, FREDDY LEE STOKES went on trial for First Degree Murder, Armed Robbery, and Felonious Larceny. LORENZO THOMAS testified against STOKES and the jury convicted STOKES of all charges and later sentenced him to death. The jury in that case found as an aggravating factor that the murder was especially henious (sic), atrocious and cruel.

Prior to the trial of JAMES H. MURRAY, RICHARD BENBOW agreed to testify for the State in return for guilty plea to Second Degree Murder and Armed Robbery with maximum exposure being life imprisonment, 50 years. Sentencing was to be left to the discretion of the trial judge. Defendant MURRAY was tried in September 1982 at which time LORENZO THOMAS and RICHARD BENBOW testified for the State. During his testimony, BENBOW admitted his part in the robbery-murder saying that he was 25 feet away from the door on the ramp as a lookout when the victim emerged and that STOKES and MURRAY beat the victim and robbed him, and that he, MURRAY and STOKES then entered the victim's car and drove away leaving co-defendant LORENZO THOMAS across the street. The car was later abandoned near the housing project where BENBOW, STOKES and THOMAS all lived or stayed. BENBOW testified that he met THOMAS, MURRAY and STOKES at the Houston-Moore project in the late afternoon hours of December 28, 1981. There they planned the robbery of KAUNO A. LEHTO at the Wilmington Bonded Warehouse. When he and the others went to the warehouse, their only purpose was to rob "the old man," meaning KAUNO A. LEHTO.

BENBOW testified that the defendant MURRAY and STOKES split the money with BENBOW refusing to take any. RICHARD BENBOW's testimony at trial differed from prior written statements he had given to police officers earlier in that he originally claimed to be across the street, some 258 feet away, not at the foot of the ramp, 25 feet away from the scene of beating, as he testified to at trial. BENBOW also claimed in his original statement that once he saw the beating administered to the victim, he turned away and ran home. At trial, he stated he remained at the foot of the ramp and entered the car with STOKES and MURRAY after the robbery was completed. Defendant BENBOW testified he had previously been convicted of two counts of misdemeanor Breaking or Entering and one count of Larceny and was at the time of the crime on probation for those offenses.

As to JAMES H. MURRAY, the jury returned a verdict of guilty to First Degree Murder, Armed Robbery and Felonious Larceny. The jury rendered a sentence recommendation to the Court of life imprisonment and made no finding as to whether or not the capital felony was especially henious (sic), atrocious, or cruel after considering it as an aggravating factor.

At the sentencing hearing, defendant's evidence in mitigation consisted of the testimony of defendant's probation officer, a clinical psychologist, one of the investigating officers of the murder, and numerous family members and friends who testified as character witnesses. Defendant testified on his own behalf. The State presented no rebuttal evidence as to the mitigating factors and relied on evidence and exhibits presented during the preceding trials of the two co-defendants to support the aggravating factors. In support of the imposition of a life sentence, the trial judge relied on the following aggravating factors:

3. The offense was committed for hire or pecuniary gain.

6. The offense was especially heinous, atrocious, or cruel.

15. The defendant has a prior conviction or convictions for criminal offenses punishable by more than 60 days confinement.

In mitigation, the trial judge found that:

8. The defendant aided in the apprehension of another felon or testified truthfully on behalf of the prosecution in another prosecution of a felony.

12. Prior to arrest or at an early stage of the criminal process, the defendant voluntarily acknowledged wrong-doing in connection with the offense to a law enforcement officer.

14. The defendant is a minor and has reliable supervision available.

Defendant assigns as error the trial court's reliance on two of the three aggravating factors: that the offense was committed for pecuniary gain and that the crime was especially heinous, atrocious, or cruel. Defendant further assigns as error the trial court's failure to find certain factors in mitigation. For errors found, defendant is entitled to a new sentencing hearing.

*Rufus L. Edmisten, Attorney General, by Robert L. Hillman and John R. Corne, Assistant Attorneys General, for the State.*

*Jay D. Hockenbury, Attorney for defendant-appellant.*

MEYER, Justice.

[1]   As the record does not support a finding that the defendant was hired or paid to commit the offense, the trial judge erred in relying on the aggravating factor that the offense was committed for pecuniary gain. *State v. Thompson,* 309 N.C. 421, 307 S.E. 2d 156 (1983); *State v. Abdullah,* 309 N.C. 63, 306 S.E. 2d 100 (1983). Defendant is therefore entitled to resentencing. *State v. Ahearn,* 307 N.C. 584, 300 S.E. 2d 689 (1983).

[2]   Defendant next assigns as error the trial court's reliance on the aggravating factor that the offense was especially heinous, atrocious, or cruel. This Court has most recently articulated the standard by which this factor may be found in *State v. Blackwelder,* 309 N.C. 410, 306 S.E. 2d 783 (1983). In *Blackwelder* we stated that "the focus should be on whether the facts of the case disclose *excessive* brutality, or physical pain, psychological suffering, or dehumanizing aspects *not normally present in that offense." Id.* at 414, 306 S.E. 2d at 786. We further stated that it was not "inappropriate in any case to measure the brutality of

the crime by the extent of the physical mutilation of the body of the deceased or surviving victim." *Id.* at 415, 306 S.E. 2d at 787. The evidence in this case supports a finding that the beating death of Kauno A. Lehto was especially heinous, atrocious, or cruel. The victim's skull was crushed and fractured in several places. The orb of one eye was driven into the brain. In spite of the continued blows to his head and the severity of the wounds, the victim lingered and remained in a semiconscious state for over twelve hours.

[3] Defendant next contends that the trial court erred in failing to find as a mitigating factor under G.S. § 15A-1340.4(a)(2)d that the defendant was suffering from a mental or physical condition that, while insufficient to constitute a defense, was sufficient to entitle him to the benefit of the mitigating circumstance that his culpability for the offense was substantially reduced. We do not agree. In support of his contention, defendant points to the uncontradicted testimony of Dr. Peter J. Boyle, a clinical psychologist, who indicated that defendant would not understand that as a lookout, he could be held legally responsible for the murder. In other words, argues defendant, while he "could anticipate the consequences of his own acts as a lookout in an armed robbery," he "would be unable, because of a borderline range of mental retardation and low general intellectual function, to comprehend what consequences the actions of [Stokes and Murray] would have on his life." We do not doubt defendant's inability at the time of the murder to comprehend the full legal implications of his decision to participate in the armed robbery of Kauno A. Lehto. Ignorance of the legal implications of an act, nothing else appearing, however, is not tantamount to a mental condition sufficient to reduce one's culpability. Similarly, defendant contends that the trial court erred in failing to find as a mitigating factor under G.S. § 15A-1340.4(a)(2)j that defendant could not reasonably have foreseen that his conduct could cause or threaten serious harm. Defendant maintains now, as he did when he was first apprehended, that he did not know he was involving himself in anything more than a simple robbery. Again, we do not doubt defendant's sincerity in stating that he failed to understand that his role as a lookout in an armed robbery could possibly result in his personal responsibility for the resulting brutal murder. The test, however, is not what the defendant subjectively does or

does not believe, but whether he could *reasonably* foresee that his conduct would cause harm. Serious bodily injury or death is an omnipresent danger in any armed robbery. The trial judge properly rejected these two factors in mitigation.

[4] Defendant next contends that the trial court erred in failing to find in mitigation that he was a passive participant or played a minor role in the commission of the offense. The evidence would not support a finding of this factor with respect to defendant's participation in the robbery. Defendant clearly played an active role in the planning and execution of the robbery. For sentencing purposes, however, the evidence could support a finding that defendant was a passive participant in the murder for which he was sentenced. Both the defendant and the State stipulated to the following facts: defendant acted as a lookout, he was not present, and he did not participate in the actual bludgeoning of the victim. Defendant's own evidence, as discussed above, indicated that he did not anticipate that a murder would be the result of the plan to rob Mr. Lehto. In fact, defendant testified that it wasn't until the next day that he learned that Mr. Lehto had been as seriously injured as he was. We emphasize that a defendant's liability for a crime, including whether he was the principal offender or an accessory, is determined at the guilt phase of a trial or, as in the case *sub judice,* by a plea. At sentencing the focus must be on the offender's *individual* culpability. It is therefore proper at sentencing to consider the defendant's actual role in the offense as opposed to his legal liability for the acts of others. On resentencing, the sentencing judge will consider whether defendant has met his burden of proving by a preponderance of the evidence that he was a passive participant in the actual murder. *State v. Jones,* 309 N.C. 214, 306 S.E. 2d 451 (1983).

Finally, defendant assigns as error the trial court's failure to find as a mitigating factor under G.S. § 15A-1340.4(a)(2)n that he has been a person of good character or has a good reputation in the community in which he lives. Defendant's evidence in support of this mitigating factor consisted of the following: Defendant's probation officer testified that after some initial problems, the defendant was complying with the conditions of his probation. He was paying his fine and attending school. He was described by family and friends as being nonviolent. "He didn't fight back." He had completed the tenth grade in school, was well-mannered and

respectful, and regularly helped his mother with household chores. He had "a little job at the Housing Authority" to pay his court fine. He spent most of his time at home listening to his music and if he went out at night to visit one of his aunts, he would call his mother and let her know where he was. He was generally truthful and until he was seventeen, attended church regularly with his grandmother. He was, however, susceptible to peer pressure and although his family cautioned him about associating with the wrong people, he continued to see Freddy Stokes and Stokes' sister, Betty, even after Stokes had beaten him severely enough to require hospitalization.

[5] When the defendant in his sentencing hearing produces evidence of his good character in order to take advantage of that particular mitigating circumstance, G.S. § 15A-1340.4(a)(2)m (Cum. Supp. 1981), character is "a direct issue in the case" and thus not limited to the traditional methods of proof but may be proved by specific acts as well as by reputation and by the opinions of others. *State v. Taylor*, 309 N.C. 570, 308 S.E. 2d 302 (1983); 1 Brandis on North Carolina Evidence §§ 102, 113. In such circumstances good character, or the lack of it, is a direct issue in the case because it is one of the "factors that may diminish or increase the offender's culpability" and thus an important consideration to be taken into account in sentencing. G.S. § 15A-1340.3 (Cum. Supp. 1981). On the question of defendant's individual culpability, evidence of character is, without question, highly relevant and directly in issue.

We have also recently held that "[w]hen evidence in support of a particular mitigating or aggravating factor is uncontradicted, substantial, and there is no reason to doubt its credibility, to permit the sentencing judge simply to ignore it would eviscerate the Fair Sentencing Act." *State v. Jones*, 309 N.C. 214, 218, 306 S.E. 2d 451, 454 (1983); *see State v. Taylor*, 309 N.C. 570, 308 S.E. 2d 302; *State v. Blackwelder*, 309 N.C. 410, 306 S.E. 2d 783 (1983). In *Blackwelder*, however, we noted that "uncontradicted, quantitatively substantial, and credible evidence may simply fail to establish, by a preponderance of the evidence, any given factor in aggravation or mitigation. While evidence may not be ignored, it can be properly rejected if it fails to prove, as a matter of law, the existence of the mitigating factor." *Id.* at 419, 306 S.E. 2d at 789.

For a definition of good character, we turn to another case in which character was a direct issue:

> Whether a person is of good moral character is seldom subject to proof by reference to one or two incidents. In the words of Chief Justice Stacy in *In re Applicants for License, supra,* 191 N.C. at 238, 131 S.E. at 663:
>
> > '[Good moral character] is something more than the absence of bad character. It is the good name which the applicant has acquired, or should have acquired, through association with his fellows. It means that he must have conducted himself as a man of upright character ordinarily would, should or does. Such character expresses itself, not in negatives nor in following the line of least resistance, but quite often in the will to do the unpleasant thing, if it is right, and the resolve not to do the pleasant thing, if it is wrong.'
>
> Character thus encompasses both a person's past behavior and the opinion of members of his community arising from it.

*In re Rogers,* 297 N.C. 48, 58, 253 S.E. 2d 912, 918 (1976).

[6]  With these principles in mind, we turn to the evidence in the case *sub judice.* This evidence paints a picture of a young man who, apart from one incident with the law for which he appeared to have been making satisfactory amends, was generally well-behaved, considerate, and respectful to family and friends. Arguably this evidence might entitle defendant to a mitigating circumstance that he was generally truthful, was good to his mother, attended church regularly as a youth, etc. The evidence does not rise to the level which would entitle defendant to a finding in mitigation that he was a person of "good character" or that he had a "good reputation." Furthermore, because defendant's character witnesses were, for the most part, family members, their relationship with the defendant was a factor in assessing these witnesses' credibility. It was therefore within the trial court's prerogative to accept or reject their testimony. *See State v. Taylor,* 309 N.C. 570, 308 S.E. 2d 302.

[7]  We note from the transcript that the district attorney placed before the sentencing judge two files apparently containing the evidence heard at the trials of Freddy Stokes and James Murray

over which Judge Stevens also presided. We must caution that for purposes of resentencing this defendant, and indeed at any sentencing hearing held pursuant to a plea of guilty, reliance on evidence from the trials of others connected with the same offense is improper absent a stipulation. Even with such a stipulation reliance exclusively on such record evidence from other trials (in which the defendant being sentenced had no opportunity to examine the witnesses) as a basis for a finding of an aggravating circumstance may constitute prejudicial error. In such other trials the focus is necessarily upon the culpability of others and not on the culpability of the defendant being sentenced. Thus, by proper stipulation and in the interests of judicial economy, the sentencing judge may consider the evidence from such other trials, but only as incidental to his present determination of defendant's individual culpability as a factor in sentencing. In so considering this evidence, trial judges must scrupulously avoid shifting the focus from the offender's *individual* culpability for the offense. *See* G.S. § 15A-1340.3; *State v. Ahearn*, 307 N.C. 584, 300 S.E. 2d 689.

The case is remanded to the Superior Court, New Hanover County, for resentencing.

Remanded for resentencing.