STATE OF NORTH CAROLINA v. JIMMY DALE HUDSON

No. 454A87

(Filed 22 April 1992)

**1. Constitutional Law § 342 (NCI4th)— ex parte conversations between judge and jurors—not "stage" of trial—constitutional right to presence at trial not violated**

It is doubtful that ex parte conversations between the judge and jurors in the courthouse corridor during a recess in a capital trial constituted a "stage" of the trial within the meaning of the constitutional right of an accused to be present at every stage of his trial. Assuming arguendo that the chance meeting in the corridor did constitute a "stage," error, if any, in the ex parte communications between the judge and jurors was harmless beyond a reasonable doubt where the trial judge reconstructed the conversations for the record; the record reveals that the conversations pertained to the presence of cameras in the courtroom, the jury's ability to hear defendant's testimony, and selection of the jury foreman and that the contents of the conversations were thus not significant; and defendant's presence at the time of the conversations could not have had a reasonably substantial relation to his ability to present a full defense.

Am Jur 2d, Criminal Law §§ 692-695; Trial §§ 226, 1573, 1577-1579.

Accused's right, under Federal Constitution, to be present at his trial—Supreme Court cases. 25 L. Ed. 2d 931.

**2. Criminal Law § 507 (NCI4th)— judge's conversations with jurors during recess—record not required**

Ex parte conversations between the judge and jurors in a courthouse corridor during a recess in a capital trial did not amount to a "proceeding" within the meaning of the statute requiring the trial court to have made a true, complete, and accurate record of all "statements from the bench and all other proceedings," N.C.G.S. § 15A-1241. Therefore, the recordation requirement of N.C.G.S. § 15A-1241 was not triggered, and the failure to record these conversations did not implicate defendant's federal due process rights.

Am Jur 2d, Trial §§ 1573, 1577-1579.

Communications between court officials or attendants and jurors in criminal trial as ground for mistrial or reversal — post-Parker cases. 35 ALR4th 890.

3. **Criminal Law § 870 (NCI4th) — encounter between judge and jurors during recess — not additional instructions — open court requirement inapplicable**

Ex parte communications between the judge and jurors in the courthouse corridor during a trial recess did not breach the mandatory requirement of N.C.G.S. § 15A-1234(d) that all additional instructions be provided in open court where the conversations pertained to cameras in the courtroom, the jury's ability to hear defendant's testimony, and selection of a jury foreman and cannot reasonably be considered as "instructions" within the meaning of the statute.

Am Jur 2d, Trial §§ 1111, 1114, 1573.

4. **Criminal Law § 406 (NCI4th) — filming of defendant's trial — exercise of discretion by court**

The record shows that the trial court did in fact exercise its discretion in allowing the filming of defendant's trial.

Am Jur 2d, Trial § 256.

5. **Constitutional Law § 261 (NCI4th) — electronic media coverage — commencement at mid-trial — no prejudice as matter of law**

Commencement of electronic media coverage of defendant's trial near mid-trial, at the time defendant began to present his case, was not prejudicial as a matter of law.

Am Jur 2d, Trial § 256.

6. **Constitutional Law § 261 (NCI4th) — rules for electronic media — court's failure to follow — no violation of due process**

Although the trial court erred in applying the rules regarding electronic media coverage of defendant's trial by failing to inform the jury that coverage of jurors is expressly prohibited at any stage of a judicial proceeding, by failing to ensure that electronic equipment was completely obscured from view in the courtroom, and by permitting a microphone to be placed at the bench to allow electronic media coverage

STATE v. HUDSON

[331 N.C. 122 (1992)]

of bench conferences, such error was not prejudicial to defendant where defendant made no specific allegations that media coverage impaired the jury's ability to decide the case on the evidence or had an adverse impact on trial participants sufficient to constitute a denial of due process.

**Am Jur 2d, Trial §§ 184, 256.**

7. **Criminal Law § 757 (NCI4th)— instruction on reasonable doubt—due process**

The trial court's instruction that a reasonable doubt "is an honest, substantial misgiving" did not reduce the State's burden of proof in violation of defendant's constitutional right to due process.

**Am Jur 2d, Trial §§ 1371-1375.**

8. **Criminal Law § 496 (NCI4th)— jury request to review testimony—denial because transcript unavailable—harmless error**

The trial court improperly failed to exercise its discretion in a prosecution for two murders when it denied the jury's request to examine the transcript of a psychiatrist's testimony because the transcript was "not available." However, this error was not prejudicial to defendant where the psychiatrist's testimony was adverse to defendant in that he concluded that defendant was sane at the time of the killings; the record reveals that the psychiatrist disagreed with the diagnoses of three defense witnesses as to whether defendant suffered from a reactive psychosis at the time of the killings; and the jury was provided with the psychiatrist's testimony in substance because his written notes were introduced into evidence and submitted to the jury for review.

**Am Jur 2d, Trial § 1690.**

9. **Criminal Law § 23 (NCI4th)— consideration of insanity issue first—failure to instruct not error**

While the better procedure would be to have the jury determine defendant's sanity before considering defendant's guilt of the substantive offenses, the trial court's failure to so instruct the jury did not constitute error.

**Am Jur 2d, Criminal Law § 107; Trial § 1270.**

**10. Criminal Law § 884 (NCI4th)— failure to instruct—absence of request**

Defendant waived his right to assign as error the trial court's failure to instruct the jury to consider purported evidence of defendant's diminished mental capacity where he failed to request such an instruction. N.C. R. App. P. 10(b)(2).

**Am Jur 2d, Criminal Law §§ 40, 41; Trial § 1081.**

**11. Criminal Law § 769 (NCI4th)— evidence of insanity— consideration after finding of guilt—instruction not violation of due process**

The trial court's instruction that the jury in a prosecution for two murders should consider evidence of defendant's legal insanity "only if you find that the State has proved beyond a reasonable doubt each of the elements of one of the offenses about which I have already instructed you" did not lessen the State's obligation to prove the elements of the crimes with which defendant was charged in violation of due process.

**Am Jur 2d, Trial § 1278.**

**12. Criminal Law § 133 (NCI4th)— plea bargain with sentence recommendation—withdrawal by State—court's refusal to enforce—no violation of due process**

The trial court did not violate defendant's federal or state due process rights by refusing to enforce a plea bargain agreement for defendant to plead guilty to two counts of second degree murder and receive two consecutive fifty-year sentences where defendant's acceptance of the agreement was communicated on 20 June 1986; the State officially withdrew the agreement by letter on 1 August 1986; the trial commenced on 9 February 1987; the alleged agreement between defendant and the State, if any, was merely executory and of no effect as a matter of law because it had not been approved by the trial judge as required by N.C.G.S. § 15A-1023(b); any reliance on the agreement by defendant was thus not reasonable; defendant's assertion of detriment on the ground that he suspended trial preparations for an insanity defense is doubtful in the face of the extensive psychiatric testimony presented at trial; and the trial court found that defendant had not changed his position in detrimental reliance upon the agreement.

**Am Jur 2d, Criminal Law §§ 481, 483, 484.**

STATE v. HUDSON

[331 N.C. 122 (1992)]

Right of prosecutor to withdraw from plea bargain prior to entry of plea. 16 ALR4th 1089.

**13. Evidence and Witnesses § 672 (NCI4th) — waiver of objection — admission of similar tesimony without objection**

Even if testimony by an emergency room physician that defendant did not appear psychotic during an emergency room visit two weeks prior to the killings in question constituted expert opinion testimony by a nonqualified witness, defendant waived objection to such testimony when defense counsel subsequently elicited similar testimony from the witness and when defendant failed to object to similar testimony thereafter elicited by the prosecutor.

Am Jur 2d, Trial §§ 411, 412, 420.

**14. Evidence and Witnesses § 765 (NCI4th) — sexual proclivities of defendant — opening door to cross-examination**

In a prosecution of defendant for the murders of his wife and child, defendant opened the door to cross-examination of defendant by the State about his sexual proclivities when defendant's statement to a detective alluding to numerous extramarital affairs was read into evidence at defendant's initiative, and defendant testified on direct examination that he and his wife were a "very erotic couple."

Am Jur 2d, Trial § 419.

**15. Criminal Law § 1148 (NCI4th) — aggravating factor — heinous, atrocious or cruel murder — sufficiency of evidence**

There was ample evidence to support the trial court's finding that defendant's second degree murder of his wife was especially heinous, atrocious or cruel where it tended to show that the murder was carried out with a butcher knife; the victim sustained numerous blunt trauma injuries to the forehead, nose, eye, and cheek areas; there was a stab wound to the right side of the neck and at least three incise wounds; one massive incise wound to the neck damaged the right and left carotid arteries and right and left jugular veins and was so deep as to damage the spine; defendant used substantial force as he slashed the victim with the murder weapon; the victim died as a result of loss of blood and possibly interference with the oxygen supply to the body because of severance of the windpipe; and as life was ebbing from the victim, defend-

.ant's three-year-old adopted child, his second murder victim, watched and cried uncontrollably.

**Am Jur 2d, Criminal Law §§ 598, 599; Homicide § 554.**

**16. Criminal Law § 1116 (NCI4th)— perjury—improper aggravating factor—nonretroactivity of opinion**

The holding in *State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373, that perjury constitutes an impermissible aggravating factor and may not, as a matter of law, be considered in the sentencing decision does not apply where defendant was sentenced ten months prior to the certification date. of that decision, 23 February 1988.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Propriety of sentencing judge's consideration of defendant's perjury or lying in pleas or testimony in present trial. 34 ALR4th 888.**

**17. Criminal Law § 1116 (NCI4th)— aggravating factor—perjury— sufficiency of evidence**

Ample evidence supported the trial court's finding of perjury as a nonstatutory aggravating factor for defendant's second degree murder of his wife where it tended to show that defendant falsely asserted under oath at trial that he attempted to commit suicide the day prior to the killing, that his wife attacked him with a butcher knife prior to the murder and this attack accounted for a number of injuries defendant complained of during his examination by a doctor on the day of the murder, that his knowledge of state law relating to the insanity defense was limited to what he was told by his counsel, and that after he was attacked by his wife he remembered nothing else until he was at the sink washing his hands.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Propriety of sentencing judge's consideration of defendant's perjury or lying in pleas or testimony in present trial. 34 ALR4th 888.**

**18. Appeal and Error § 550 (NCI4th)— perjury as improper aggravating factor—nonretroactivity—no due process violation**

Failure to apply retroactively the rule of *State v. Vandiver*, 321 N.C. 570, that perjury is an improper nonstatutory ag-

STATE v. HUDSON

[331 N.C. 122 (1992)]

gravating factor does not violate defendant's federal or state due process rights since the "new rule" before the Supreme Court is not of constitutional magnitude.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Propriety of sentencing judge's consideration of defendant's perjury or lying in pleas or testimony in present trial. 34 ALR4th 888.**

**19. Criminal Law § 1245 (NCI4th) — mitigating factor — extenuating relationship — marital difficulties**

A relationship between a husband and wife, including marital difficulties in the past, is not sufficient, standing alone, to support a finding of the statutory mitigating factor that the relationship between defendant and the victim was extenuating. N.C.G.S. § 15A-1340.4(a)(2)(i).

**Am Jur 2d, Criminal Law §§ 598, 599.**

Justice WEBB concurring.

APPEAL as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a life sentence upon defendant's conviction of first-degree murder entered by *Ross, J.,* at the 9 February 1987 Special Criminal Session of Superior Court, GUILFORD County. Defendant's motion to bypass the Court of Appeals, pursuant to N.C.G.S. § 7A-31, as to his second-degree murder conviction, for which he received a consecutive sentence of fifty years, was allowed by this Court 14 January 1992. Heard in the Supreme Court 12 February 1992.

*Lacy H. Thornburg, Attorney General, by John H. Watters, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Gordon Widenhouse, Assistant Appellate Defender, for defendant-appellant.*

MEYER, Justice.

On 24 March 1986 at approximately 8:00 p.m., defendant Jimmy Dale Hudson visited the Greensboro police department and spoke with Officer Gregory Deans. According to Deans, defendant appeared calm and his face was expressionless. Defendant related that he had an argument with his wife, Kathryn Hudson, and that

she had come at him with a butcher knife. He took the knife away from her and did not remember what next occurred, but he thought he might have killed her and that his daughter, three-year-old Wilma Dale Hudson, might have gotten in the way. Defendant informed Deans that he himself had been cut about the neck, hand, and chest in the melee. Defendant provided Deans with directions to the apartment where the killings occurred.

Defendant was taken to the emergency room at Wesley Long Hospital. While en route, defendant asked Deans if anyone had visited the apartment. Deans responded that he did not know, and defendant told Deans, "I know what they'll find when they get there." At the hospital, Dr. James Kindl examined defendant and discovered superficial scratches to the neck most likely caused by fingernails. A one-inch superficial wound that required no stitches was detected on defendant's chest. A two-inch laceration on the thumb side of the palm of defendant's left hand was also evident; this wound was not deep but required seven stitches to close. A tiny cut over the knuckle of the index finger of defendant's left hand required no treatment whatsoever. Finally, defendant complained of soreness on his right wrist. There were no obvious signs of cuts or bruises, and the wrist retained a full range of motion.

At approximately 8:25 p.m., police arrived at the scene of the killings and observed the lifeless body of a small child lying on the floor in a pool of blood, with a large gaping laceration in her neck. A butcher knife with a five-inch blade covered almost entirely in blood lay four or five feet from the body of the child. In the living area, officers observed the body of a white female, lying face upward on the floor. She also had a large neck wound and appeared to be dead. The adult female had a handkerchief stuffed inside the neck wound.

The apartment appeared to be in order, with no broken furniture or anything out of arrangement. A blue oxford shirt, later identified as being the shirt worn by defendant on the night of the killings, was discovered on the landing of the apartment by the stairs. The shirt had no holes in the shoulder area.

A 1979 Volkswagen driven by defendant to the police station was also inspected. The inspection revealed bloodstains on the steering wheel, horn, seat, and the driver's side floor mat. Also found was a brown leather briefcase on the back seat and a man's shaving kit under the front seat containing a .38-caliber revolver.

STATE v. HUDSON

[331 N.C. 122 (1992)]

The revolver was lying exposed on the top of the kit and, unlike the kit, had blood on it.

Roger McQueen, currently serving time for a double murder, testified for the State. In 1986, McQueen met defendant in the course of his work in the law library at the Eastern Correctional Center, where McQueen assisted inmates in legal research. Defendant confided in McQueen that he was charged with one count of first-degree murder. Defendant went into great detail so that McQueen could provide an opinion as to whether premeditation and deliberation existed and whether an insanity defense was tenable. Defendant first told McQueen that the killing occurred as a result of an argument between him and his wife. At a subsequent meeting, defendant informed McQueen that there was actually a second killing, the latter involving Wilma Dale Hudson. Defendant related that the child was present at the time Kathryn was killed, that the child began to cry, and that defendant sent her to her room. The daughter returned and defendant killed her. McQueen asked defendant how long the interval was between killings, and defendant replied that it was longer than fifteen minutes. Defendant told McQueen that he killed the little girl "to make it fit." Defendant never told McQueen anything about his wife's approaching him with a butcher knife.

Defendant testified in his own behalf. Defendant and Kathryn Hudson met while in school at the University of North Carolina at Chapel Hill. The couple married in 1971. In 1974, defendant graduated from dental school and began a practice in Robbinsville, North Carolina. He left the practice in 1979, moving to Greensboro to begin a practice with Dr. Julian Rogers. After a year and a half, defendant became a full partner. The Hudsons adopted a female child in 1983, naming her Wilma Dale Hudson. In December 1985, defendant was informed by his partners that they wanted him out of the practice. He was disassociated in 1986 and thereafter worked on a temporary basis for other dentists.

On the evening of 7 March 1986, defendant arrived at his home and discovered a letter from his wife informing him that she and Wilma Dale had moved out and that she had an attorney. After several unsuccessful attempts, defendant finally located his wife by phone; she refused to discuss the problem and kept telling defendant to read the letter. On 13 March, defendant and Kathryn

signed a separation agreement. Shortly after signing the agreement, defendant left the country for a vacation.

Upon his return, defendant arranged to spend the day with Wilma Dale. When they returned, defendant and his estranged wife talked. Some time later, Kathryn asked defendant to leave, as she had to prepare dinner. Defendant testified that he resisted and became hysterical. He began to leave and Wilma Dale ran over to him and he began hugging and kissing her. Kathryn became angry and began yelling at defendant. Kathryn then came over to defendant and slapped him twice. She then approached defendant with a knife, and defendant was unable to remember anything else until he was washing his hands at the sink. Defendant turned around and Wilma Dale was on the floor. He noticed the two bodies and that they lacked signs of life. Defendant then entered his car and drove around the area. He eventually made his way to the police station. When at the station, he contemplated suicide but was unable to carry it out. Defendant testified that he remembered being cut on his left hand but none of his other injuries.

Considerable testimony was mounted concerning defendant's mental condition at or about the time of the killings. Dr. Bob Rollins, Clinical Director of the Forensic Unit at Dorothea Dix Hospital, evaluated defendant in March and April 1986. Rollins diagnosed defendant as having a mixed personality disorder with narcissistic and dependent features. He also testified that defendant was able at the time of the murder to distinguish right from wrong and that defendant did not suffer from a brief reactive psychosis at the time of the killings.

Drs. John Edwards, Selwyn Rose, and Donald Fidler all testified that defendant was unable to distinguish right from wrong and that defendant suffered from a reactive psychosis at the time of the killings.

Dr. Aldo Mell examined defendant in the Guilford County jail on 26 March 1986. Mell testified that defendant was probably suffering atypical psychosis and that he recommended a full psychiatric evaluation and transfer to Dorothea Dix.

The jury convicted defendant of one count of second-degree murder for the murder of Kathryn Hudson and one count of first-degree murder for the murder of Wilma Dale Hudson. The jury recommended a sentence of life imprisonment on the first-degree

STATE v. HUDSON

[331 N.C. 122 (1992)]

murder conviction. The trial court imposed a mandatory life sentence for the first-degree murder and a consecutive fifty-year term for the second-degree murder.

Defendant raises numerous claims on appeal. We will address these claims seriatim.

Defendant first claims that the trial court committed reversible error in engaging in ex parte conversations that were not recorded and that took place out of the presence of defendant and his counsel.

Defendant was the first witness to testify for the defense. During the course of the lengthy direct examination, the court took its regularly scheduled afternoon recess. When court reconvened, outside the presence of defendant and the jury, the judge recounted to counsel at a recorded bench conference conversations he had had with various jurors during the recess. The following colloquy occurred involving the court, defense attorneys Manning and O'Donnell, and district attorneys Greeson and Goodman:

(A recess was taken at 3:16 p.m.)

(Court reconvened at 3:39 p.m. All counsel were present. The defendant was not present. The jury was not present.)

THE COURT: Approach the bench, counsel.

(The following proceedings were had by the Court and all counsel at the bench:)

THE COURT: Just for the record, so you all will know — and I've told them right back here just now — that when I left the courtroom to go up around the corner, one of the jurors, the first words out of their [sic] mouth was, "We didn't realize that they allowed cameras in the courtroom."

And I said, "Well, you weren't supposed to see that."

(The defendant entered the courtroom at 3:40 p.m.)

THE COURT: And they said, well, it was hard not to notice, with all the cable and the wire. And one of them said, "And they left the tape in our chair."

And I said, "Well, all I can say to you about it is that, the Supreme Court has authorized that, under certain circumstances." And I said, "I would say to you now, as I've said all along, that this is the reason why you're not to observe

any of that on television at night, because they may record some particular part." And I said, "If you're interested in it, have somebody tape it, and you can view it after the trial's over, but you're not to view it."

And they said, "Well, we understand."

But I just wanted you to know that had occurred, in case either of you now wish me to instruct them in open court about the fact that the cameras are in there, and that they're—

MR. GREESON: If there was only—

THE COURT: —to erase that—

MR. GREESON: —two of them that said that—

THE COURT: Oh, there were five or six of them around there at that point, you know. And they clearly know.

MR. GREESON: I don't care.

THE COURT: They talked about it among themselves.

MR. GOODMAN: They all know.

MR. O'DONNELL: Just for at the end of the day—

THE COURT: Yes, that's what I mean, as part of my normal explanation at the close of the day.

MR. O'DONNELL: That's fine.

THE COURT: The other thing, they mentioned to me out there in the hall, and again, for the record is, that they were having difficulty hearing Dr. Hudson. I've told Mr. Manning that. And I told the jurors, I said, you know, that when they were not able to hear, that I've instructed them previously to raise their hand, and I will ask him to speak up.

And they said, was there not a microphone, couldn't they turn up the microphone for the sound?

And I said, "Well, those microphones don't have anything do to [sic] with sound. We don't have any microphones that have anything to do with sound in this courtroom."

And then they wanted to know, who selected the foreman, was it appointed, or did the jury vote on it. I explained—

**STATE v. HUDSON**

[331 N.C. 122 (1992)]

MR. MANNING: Oh, geez.

THE COURT: —to them that—

MR. GREESON: That's what I say.

THE COURT: I explained to them that they would be—

MR. GREESON: Have they got—

THE COURT: —instructed with respect—

MR. GREESON: —somebody running already?

THE COURT: I don't know. I explained to them that there would be instructions with respect to that at a later time in the proceedings.

MR. MANNING: There's probably going to be a primary run-off election to see who's the foreman.

THE COURT: Well, there could be—

MR. GOODMAN: We could voir dire them to find out who it's going to be.

THE COURT: It might be a hung jury on that issue. There is a story, you know, about where the jury—an open-and-shut case, where the judge sent the jury out and told them they could select a foreman. They were about two hours, and he couldn't understand why. He finally called them back in and they said, "Judge, we're hung up six to five."

And he said, "Well, we haven't even given you the issues sheet yet."

"We're hung up six to five, judge, on who's the foreman."

I just advise you of that, because I like to let you know when there's been any kind of contact like that, first of all. And second of all, I wanted you to know so that if you request any instructions, you'll be aware of it and you can request them.

MR. GREESON: That's fine, Judge.

THE COURT: Okay?

MR. MANNING: Okay.

**STATE v. HUDSON**

[331 N.C. 122 (1992)]

Defendant contends that the ex parte conversations recounted above were improper in three respects. First, defendant argues that the conversations violated defendant's state constitutional right to be present at each stage of the capital proceeding. N.C. Const. art. I, § 23. Second, defendant argues that the conversations violated defendant's federal constitutional right to due process of law because he was effectively deprived of a state statutory entitlement, namely, the right to a true, complete, and accurate record of all proceedings during his capital trial. N.C.G.S. § 15A-1241 (1988). Finally, defendant argues that the conversations violated defendant's right to a complete recordation of the proceedings in his capital trial as required by N.C.G.S. § 15A-1241.

It is well settled that a defendant in a capital trial has an unwaivable right to be present at every stage of his trial. *State v. Payne*, 320 N.C. 138, 139, 357 S.E.2d 612, 612 (1987) ("*Payne I*"). "This Court has repeatedly held that nothing should be done prejudicial to the rights of a person on his trial for a capital felony unless he is actually present . . . ." *State v. Jacobs*, 107 N.C. 772, 779, 11 S.E. 962, 964 (1890). This right to presence derives from the Confrontation Clause of our State Constitution. N.C. Const. art. I, § 23; *State v. Huff*, 325 N.C. 1, 29, 381 S.E.2d 635, 650-51 (1989), *sentence vacated*, --- U.S. ---, 111 L. Ed. 2d 777 (1990), *on remand*, 328 N.C. 532, 402 S.E.2d 577 (1991). Significantly, however, any violation of a defendant's right to be present is subject to a harmless error analysis. *State v. Artis*, 325 N.C. 278, 297, 384 S.E.2d 470, 480 (1989), *sentence vacated*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991). Such harmlessness must be proven beyond a reasonable doubt by the State. *Huff*, 325 N.C. at 33, 381 S.E.2d at 653.

[1] As a preliminary matter, we must first determine whether the conversations in the instant case, which took place in a courtroom corridor and during a trial recess, constitute a "stage" as that term has been interpreted in our jurisprudence pertaining to the constitutional right to presence. It is now well settled that our state constitutional right of confrontation is broader than that embedded in the federal Constitution, "guaranteeing the right of every accused to be present at *every stage* of his trial." *Huff*, 325 N.C. at 29, 381 S.E.2d at 651.

Recently, in *State v. Brogden*, we stated that "a defendant charged with capital murder 'has the right to be, and must be,

STATE v. HUDSON

[331 N.C. 122 (1992)]

personally present at all times in the course of his trial, when anything is done or said affecting him as to the charge against him . . . , in any material respect.'" 329 N.C. 534, 541, 407 S.E.2d 158, 163 (1991) (quoting *State v. Kelly*, 97 N.C. 404, 405, 2 S.E. 185, 185-86 (1887) ). Our case law has also acknowledged that where the conversations are held is not dispositive. *State v. Buchanan*, 330 N.C. 202, 221, 410 S.E.2d 832, 843 (1991) ("as a practical matter not all of the proceedings in an accused's capital trial occur in the courtroom itself"). Nor, for that matter, is a defendant's confrontation right rendered inapplicable merely because the conversations transpired over the course of a recess. For instance, in *Payne I* the Court ordered a new trial when the trial court, during a jury recess, administered its admonitions in the jury room. The jury recess became a "stage" when the court, in derogation of its duty to ensure the presence of defendant at each stage of the capital trial, directly addressed the jury. *Payne I*, 320 N.C. at 139, 357 S.E.2d at 612; *see also State v. Braswell*, 312 N.C. 553, 324 S.E.2d 241 (1985) (defendant not present during voir dire of jurors during recess).

Under the instant facts, it is not at all clear whether the conversations between judge and jurors constitute a "stage." The conversations here were indisputably unintended and spontaneous, and not at the behest of the judge, occurring in the corridor of the courthouse during a trial recess. Thus, even under our relatively liberal reading of the constitutional right to presence, it is doubtful that such conversations may be equated with a "stage" in any meaningful sense.[1]

Assuming arguendo that the chance meeting in the corridor did constitute a "stage," we nevertheless conclude that the error here, if any, is harmless beyond a reasonable doubt.

---

1. Support for this view is contained in the recent United States Supreme Court case *Rushen v. Spain*, 464 U.S. 114, 78 L. Ed. 2d 267 (1983). *See id.* at 118, 78 L. Ed. 2d at 273 (per curiam) ("There is scarcely a lengthy trial in which one or more jurors does not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial."); *id.* at 125-26, 78 L. Ed. 2d at 277 (Stevens, J., concurring) ("I think it quite clear that the mere occurrence of an ex parte conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right. The defense has no constitutional right to be present at every interaction between a judge and a juror, nor is there a constitutional right to have a court reporter transcribe every such communication.").

STATE v. HUDSON

[331 N.C. 122 (1992)]

Citing *State v. Smith*, 326 N.C. 792, 392 S.E.2d 362 (1990), and *State v. McCarver*, 329 N.C. 259, 404 S.E.2d 821 (1991), defendant contends that prejudicial error occurred as a result of the unrecorded ex parte communications between judge and jurors here. In *Smith*, the trial judge had private, unrecorded bench conferences that resulted in the excusal of a number of prospective jurors. This Court concluded that the conversations denied defendant his constitutional right to presence and, further, that this violation was not harmless beyond a reasonable doubt. *Smith*, 326 N.C. at 794, 392 S.E.2d at 363-64. The Court was constrained to conclude that harmlessness was not shown because there existed no record of the conversations such as to reveal their substance. *Id.* Moreover, the Court found support for its conclusion in the fact that the trial judge failed to comply with the statutory requirement that there be made a complete and accurate record of the jury selection process in defendant's capital trial. N.C.G.S. § 15A-1241(a) (1988); *Smith*, 326 N.C. at 794-95, 392 S.E.2d at 363-34.

In *McCarver*, the trial judge had conversations with numerous prospective jurors that were unrecorded and out of the presence of both defendant and his counsel. These conversations apparently concerned the fitness of the jurors to hear the capital case. Subsequent to the conversations, the judge excused numerous jurors "for good cause shown." 329 N.C. at 260, 404 S.E.2d at 821. Citing *Smith* and *Payne I*, the Court held that the conversations violated defendant's right to be present and that the unrecorded violations could not be deemed harmless beyond a reasonable doubt because no record was made of the conversations. *McCarver*, 329 N.C. at 261, 404 S.E.2d at 822.

The case at bar differs from *Smith* and *McCarver* in several significant respects. First, unlike *Smith* and *McCarver*, in the instant case there exists in the record a reconstruction of the ex parte conversations. In this respect, the facts here resemble those in *Artis*, where the existence of the memorialization facilitated the harmlessness review, which ultimately allowed a finding of harmlessness. *Artis*, 325 N.C. at 297, 384 S.E.2d at 480. We have no reason to doubt the completeness or accuracy of the trial court's memorialization, and the lack of any objection by defendant in this regard lends support to this view. Moreover, the record reveals that the content of the conversations was not significant. Therefore, under the circumstances, we are unable to conclude that defendant's presence at the time of the conversations "could have had

a reasonably substantial relation to his ability to present a full defense." *Payne I*, 320 N.C. at 139, 357 S.E.2d at 612.

[2] Defendant also contends that his federal constitutional right to due process of law was violated by the trial court's failure to make a true, complete, and accurate record of all "statements from the bench and all other proceedings" in his capital trial, as required by N.C.G.S. § 15A-1241. Defendant's pretrial motion for recordation was granted; however, as noted above, aspects of the proceedings, most notably ex parte conversations between judge and jurors in the courthouse corridor, were not recorded. Defendant, citing *Hopt v. Utah*, 110 U.S. 574, 28 L. Ed. 262 (1884), argues that this violation of his statutory guarantee violates due process.

We disagree. As discussed above, we do not deem the chance encounters in the corridor a "proceeding." Therefore, the recordation requirement of N.C.G.S. § 15A-1241 was not triggered, and defendant's federal constitutional right to due process was not implicated.

Finally, defendant's claim that N.C.G.S. § 15A-1241 was violated because of the unrecorded ex parte conversations is meritless. As already discussed, the conversations did not amount to a "proceeding" within the meaning of that statute, and therefore the recordation requirement was not violated.

[3] Next, defendant contends that the chance encounter between the trial judge and five or six jury members breached the mandatory requirement that all additional instructions be provided in open court. N.C.G.S. § 15A-1234(d) (1988); *State v. Ashe*, 314 N.C. 28, 331 S.E.2d 652 (1985). Here, defendant contends, the trial court memorialized communications cautioning some but not all jurors regarding the presence of electronic media and other matters. Scrutiny of the record, however, reveals that defendant's claim is without merit.

As a threshold matter, the conversations, which took place well before the jury retired, cannot reasonably be considered to be "instructions" within the meaning of N.C.G.S. § 15A-1234(d). Further, no objections were lodged by defense counsel as to the conversations regarding the jury's ability to hear defendant's testimony or the selection of a jury foreman, the other two matters discussed in the corridor. Therefore, the question is whether the record revealed "plain error." We conclude that no "plain error"

occurred here. *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375 (1983).

Defendant next contends that the trial court committed reversible error in overruling defendant's objections to the filming of his trial and in failing to properly apply the rules we have mandated regarding such filming. Shortly before the State rested its case, the trial court informed counsel that the news media wished to film the trial. The following day, the trial court, over defense objections, announced its intention to permit the filming and related a number of instructions it had imposed to ensure the unobtrusive filming of the trial.

[4] Defendant first argues that the trial court failed to exercise the discretion granted to it by this Court in *Order Concerning Electronic Media and Still Photography of Public Judicial Proceedings*, 306 N.C. 797 (1982) [hereinafter *Order Concerning Electronic Media*]. *See also* General Rules of Practice for the Superior and District Courts, Rule 15 (1992). In *Order Concerning Electronic Media*, we expressly provided that "[t]he presiding judge shall at all times have authority to prohibit or terminate electronic media and still photography coverage of public judicial proceedings." *Order Concerning Electronic Media*, 306 N.C. at 797. Citing *State v. Ashe*, 314 N.C. 28, 35-37, 331 S.E.2d 652, 656-58, defendant contends that the trial court failed to exercise the discretion provided to it and this amounted to reversible error. However, after a review of the pertinent parts of the trial transcript we find no error to have occurred here, as the record reveals that the trial court exercised its discretion in allowing the filming of defendant's trial. *See State v. Eason*, 328 N.C. 409, 427, 402 S.E.2d 809, 816 (1991) (finding that trial judge did not use the words, "I am allowing it in my discretion," is not dispositive if the record shows the exercise of discretion).

[5, 6] Defendant also argues that the trial court erred in numerous respects in its implementation of the procedural requirements we set out in *Order Concerning Electronic Media* to ensure unobtrusive media coverage of trials.[2] First, defendant claims that the

---

2. In the case at bar, the court was approached by the media not at the outset of trial, a time apparently contemplated by our directives in *Order Concerning Electronic Media*, but rather at the near midpoint of the proceeding. We do not believe that the timing of the decision to allow media coverage diminishes in any way the importance of the procedural safeguards set in place in *Order*

court erred when it failed to instruct the jury that "[c]overage of jurors is prohibited expressly at any stage of a judicial proceeding." 306 N.C. at 797. Subsection 2(d) of our mandate provides that jurors *shall* be informed of this prohibition at the beginning of the jury selection process. *Id.* In this regard, the record reveals that it was the court's intention not to advise the jury that filming was taking place, and defendant's counsel agreed that defendant would rather the jury not be informed. The court stated to both counsel: "I don't intend to advise the jury that there's a camera in the courtroom. I don't think they'll know it." Second, defendant claims that the trial court violated *Order Concerning Electronic Media* by not ensuring that "[t]he location of equipment" for the media "shall be at a place . . . completely obscured from view from within the courtroom." *Id.* at 798. That the equipment was not so obscured is evident on the basis of comments made by members of the jury during recess, as discussed above. Third, defendant claims that the trial court erred when it permitted a microphone to be placed at the bench to allow electronic media coverage of bench conferences. Once again, *Order Concerning Electronic Media* expressly prohibits such coverage, stating that "there shall be no audio pickup or broadcast of conferences which occur . . . between counsel and the presiding judge held at the bench." *Id.* at 800-01.

Applying the standard of review articulated by the United States Supreme Court in *Chandler v. Florida*, 449 U.S. 560, 66 L. Ed. 2d 740 (1981), we find that while the trial court did err in applying the rules regarding the media coverage of the trial, such error did not prejudice defendant. In *Chandler*, the Court considered whether the filming of defendants' criminal trial violated due process. In rejecting defendant's constitutional claim, the Court stated:

> [T]he appellants have not attempted to show with any specificity that the presence of cameras impaired the ability of the jurors to decide the case on only the evidence before them or that their trial was affected adversely by the impact on any of the participants of the presence of cameras and the prospect of broadcast.

*Id.* at 581, 66 L. Ed. 2d at 756.

---

*Concerning Electronic Media.* However, we reject defendant's contention that commencement of media coverage at near mid-trial, at a time a defendant begins to present his case, is prejudicial as a matter of law.

**STATE v. HUDSON**

[331 N.C. 122 (1992)]

Like the *Chandler* Court, we reject defendant's claim of prejudice in the instant case. Rather than making specific allegations of prejudice, defendant makes only "generalized allegations of prejudice," *id.* at 577, 66 L. Ed. 2d at 753, which of themselves do not demonstrate prejudice of constitutional dimension. Indeed, the record reveals that defendant was aware of the jurors' cognizance of the media coverage yet made no objection. We therefore conclude that this claim has no merit.

**[7]** Defendant next contends that the jury instruction on reasonable doubt given in his case was constitutionally infirm. The instruction provided was as follows:

A reasonable doubt, as that term is employed in the administration of criminal law, *is an honest, substantial misgiving*, generated by the insufficiency of the proof, an insufficiency which fails to convince your judgment and conscience and satisfy your reason as to the guilt of the accused.

This does not mean satisfy beyond any doubt, nor satisfy beyond all doubt, nor does it mean satisfy beyond a shadow of a doubt, or some vain, imaginary or fanciful doubt.

A reasonable doubt is a doubt based on reason and common sense, arising out of some or all of the evidence that has been presented, or lack or insufficiency of the evidence, as the case may be. Proof beyond a reasonable doubt is proof that fully satisfies or entirely convinces you of the defendant's guilt.

(Emphasis added.)

Citing *Cage v. Louisiana*, --- U.S. ---, 112 L. Ed. 2d 339 (1990), defendant contends that the trial court unconstitutionally reduced the State's burden of proof as to his guilt. In *Cage*, the Supreme Court considered whether the following instruction on reasonable doubt violated defendant's due process rights:

[Reasonable doubt must be] *"such doubt as would give rise to a grave uncertainty*, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. *It is an actual substantial doubt*. It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a *moral certainty."*

*Id.* at ---, 112 L. Ed. 2d at 342 (quoting *Louisiana v. Cage*, 554 So. 2d 39, 41 (La. 1989) ). In construing the instruction, the Court considered "how reasonable jurors could have understood the charge as a whole." *Id.*[3] The Court concluded that the combination of the terms in the reasonable doubt instruction amounted to constitutional error, stating:

> The charge did at one point instruct that to convict, guilt must be found beyond a reasonable doubt; but it then equated a reasonable doubt with a "grave uncertainty" and an "actual substantial doubt," and stated that what was required was a "moral certainty" that the defendant was guilty. It is plain to us that the words "substantial" and "grave," as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard. When those statements are then considered with the reference to "moral certainty," rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause.

*Id.* (citation omitted). Accordingly, the Court reversed the conviction of the defendant in *Cage* and remanded the case for further proceedings not inconsistent with its opinion.

Defendant argues that the trial court here impermissibly equated reasonable doubt with "an honest, substantial misgiving" and, in so doing, ran the risk that the jury could find guilt "based on a degree of proof below that required by the Due Process Clause." *Id.* We disagree. Significantly, the combination of the terms found offensive by the *Cage* Court is not present here. Indeed, none of the objectionable language present in *Cage*, "grave uncertainty," "actual substantial doubt," or "moral certainty," is evident in the instant jury instruction. Rather, here we are concerned merely with the phrase "substantial misgiving." Thus, like other courts that have considered this question, we conclude that the reasonable

---

3. In *Estelle v. McGuire*, --- U.S. ---, 116 L. Ed. 2d 385 (1991), the Supreme Court reconsidered the standard of review articulated in *Cage* regarding jury instructions and reasserted the standard first enunciated in *Boyde v. California*, 494 U.S. 370, 108 L. Ed. 2d 316, *reh'g denied*, 495 U.S. 924, 109 L. Ed. 2d 322 (1990). In *Estelle*, the Court inquired " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle*, --- U.S. at ---, 116 L. Ed. 2d at 399 (quoting *Boyde*, 494 U.S. at 380, 108 L. Ed. 2d at 329).

doubt instruction given here is not constitutionally unsound. *See Parker v. Alabama*, 587 So. 2d 1072, 1085 (Ala. Crim. App. 1991); *South Carolina v. Johnson*, 410 S.E.2d 547, 554 (S.C. 1991), *cert. denied*, --- U.S. ---, 118 L. Ed. 2d 404 (1992).[4] Further support for this view is found in our prior case law that has repeatedly held that a definition of reasonable doubt does not require exactitude. *See State v. Watson*, 294 N.C. 159, 167, 240 S.E.2d 440, 446 (1978) ("the definition should be given in substantial accord with those approved by this [C]ourt, although no exact formula is required"). Indeed, the instruction provided by the trial court here is virtually identical to the instruction approved by this Court in *Watson*. In sum, we reject defendant's claim that the reasonable doubt instruction provided by the trial court here violated defendant's constitutional right to due process.

[8] In his next assignment of error, defendant contends that the trial court abused its discretion in refusing to comply with the jury's request to examine the transcript of the testimony of Dr. Bob Rollins. During the course of its deliberation, the jury requested the written reports of expert witnesses who testified to defendant's mental capacity and ability to differentiate between right and wrong. Dr. Rollins had not prepared a written report, so no such report was introduced into evidence or available to the jury; however, the written notes of Rollins were admitted into evidence and were available to the jury. The jury also requested a transcript of Rollins' testimony. The trial court then permitted the jury to review the available written reports of the others and the notes of Dr. Rollins but refused to permit the jury to examine a transcript of the Rollins testimony.

Under N.C.G.S. § 15A-1233, the trial court has the discretionary authority to permit the jury to reexamine writings that have been received into evidence and to rehear specified parts of the testimony heard at trial. N.C.G.S. § 15A-1233 (1988). In *State v. Ashe*, 314 N.C. 28, 34, 331 S.E.2d 652, 656, we stated that pursuant to N.C.G.S. § 15A-1233 "the trial court must exercise its discretion in determining whether to permit requested evidence

---

4. Additional support for the narrow reading of the Court's *Cage* opinion is found in *Gaskins v. McKellar*, --- U.S. ---, 114 L. Ed. 2d 728, *reh'g denied*, --- U.S. ---, 115 L. Ed. 2d 1098 (1991). There, Justice Stevens noted that the Court correctly denied certiorari because the jury instruction in *Gaskins* did not contain the "grave uncertainty" language condemned in *Cage*. *Id.* at ---, 114 L. Ed. 2d at 728-29 (Stevens, J., concurring).

to be read to or examined by the jury." Citing *Ashe* and *State v. Lang*, 301 N.C. 508, 272 S.E.2d 123 (1980), defendant contends that the trial court here failed to exercise its discretion. In *Lang*, after beginning deliberations, the jury requested that trial testimony be read to it. Denying the request, the trial court stated:

> "No sir, the transcript is not available to the jury. The lady who takes it down, of course, is just another individual like you 12 people. And what she hears may or may not be what you hear, and 12 of you people are expected, through your ability to hear and understand and to recall evidence, to establish what the testimony was."

*Lang*, 301 N.C. at 510-11, 272 S.E.2d at 125. The *Lang* Court concluded that the response by the trial judge was not an exercise of discretion and that the denial of the request because the transcript was "not available" was error. A similar result was reached in *Ashe*, where we found error on an identical basis. *Ashe*, 314 N.C. at 35, 331 S.E.2d at 656-57. Similar facts are present in the instant case. Here, the court responded to the jury's request as follows:

> I will provide you with the notes and report of Dr. Edwards, the notes and report of Dr. Rose, the notes of Dr. Rollins, the report of Dr. Dees, the report of Dr. Newmark, and the statement of Mr. McQueen.
>
> Now, with respect to any request for a transcript of any portions of the testimony, I would say to you that *there is no transcript available at this time* of any of the testimony. I would further say to you, as I did during my earlier instructions to you, that you are to rely on your recollection of the evidence as it was presented during the course of the trial during your deliberations.

(Emphasis added.) We find the above passage to be indistinguishable from that related to the juries in *Lang* and *Ashe* and held improper by this Court in those cases.

However, unlike *Lang* and *Ashe*, the trial court's action here did not involve prejudice amounting to reversible error. In both *Lang* and *Ashe*, the only defense presented related to alibi, and the jury desired to review evidence pertaining to this all-important matter. Here, on the other hand, the Rollins testimony was actually adverse to defendant because Rollins concluded that defendant was sane at the time of the killings. Also, the record reveals that Dr.

Rollins disagreed with the diagnoses of defense witnesses Edwards, Fidler, and Rose as to the defendant suffering from brief reactive psychosis. Furthermore, the jury was provided with the Rollins testimony in substance because his written notes were introduced into evidence and submitted to the jury for review. Therefore, we deem this claim to be meritless.

Defendant next argues that the trial court erred when it denied defendant's request to instruct the jury on the defense of insanity following its instructions on each particular offense. Specifically, the trial court instructed the jury to "consider this evidence [of defendant's legal insanity], only if you find that the State has proved beyond a reasonable doubt each of the elements of one of the offenses about which I have already instructed you." This instruction, defendant contends, was improper as it precluded the jury from considering "the substantial evidence of defendant's diminished, impaired mental capacity on the issues of premeditation, deliberation, specific intent to kill, or malice." Moreover, defendant contends that the instruction violated the federal and state Constitutions by relieving the State of a significant portion of its burden of proof because it required defendant to prove lack of capacity to the satisfaction of the jury before the jury was able to consider the evidence regarding the various offense elements.

With this assignment, we revisit the familiar territory encountered in our case of *State v. Cooper*, 286 N.C. 549, 213 S.E.2d 305 (1975).[5] In *Cooper*, defendant was charged with the murders of his wife and four of his children. A forensic psychiatrist testified at trial that defendant suffered from paranoid schizophrenia and that defendant was unable to distinguish right from wrong at the time of the murders. The trial court failed to instruct the jury that it should consider the evidence of defendant's mental disease on the question of premeditation and deliberation. *Id.* at 572, 213 S.E.2d at 320. The jury found that defendant was not legally insane at the time of the killings and convicted him of five counts of

---

5. Defendant also urges that this case is somehow controlled by *State v. Shank*, 322 N.C. 243, 367 S.E.2d 639 (1988). *Shank*, however, concerned the impropriety of the trial court's failure to allow expert opinion testimony as to defendant's diminished capacity at the time of the first-degree murder with which he was charged. We found this refusal to be error, concluding that under Rule of Evidence 704 such testimony was admissible and it concerned the element of premeditation and deliberation, making it highly relevant. In the case at bar, we consider the propriety of the trial court's instructions to the jury, a wholly distinct matter.

first-degree murder, resulting in the imposition of five sentences of life imprisonment. On appeal, the defendant argued before this Court that the trial court erred in failing to instruct the jury that it should consider evidence of his mental disease on the question of whether he premeditated and deliberated the killings. We held that no reversible error occurred. *Id.* at 572-73, 213 S.E.2d at 320-21.

[9]   As an initial matter, we reject defendant's contention that the trial court erred in refusing a defense request to have the jury determine defendant's sanity first, before considering defendant's guilt as to the substantive offenses. This option was considered in *Cooper* to be the "better procedure," relative to the procedure employed in the case at bar. However, the *Cooper* Court stated that such a procedure was merely advisory and held that the failure to so instruct did not constitute error. *Cooper*, 286 N.C. at 571, 213 S.E.2d at 320; *see also State v. Adcock*, 310 N.C. 1, 21, 310 S.E.2d 587, 599 (1984). We conclude likewise here.

[10]   We also reject defendant's contention that the trial court's instruction to the jury was in error because it precluded the jury from considering purported evidence of defendant's diminished mental capacity. The record fails to reveal any evidence that such an instruction was requested. Therefore, under Rule 10(b)(2), defendant waived his right to assign as error the trial court's failure to so instruct. N.C. R. App. P. 10(b)(2).

[11]   Similarly, we reject defendant's claim that the trial court's instruction violated due process because it impermissibly lessened the State's obligation to prove the elements of the crimes with which he was charged. The identical claim was addressed by this Court in *State v. Mize*, 315 N.C. 285, 292-94, 337 S.E.2d 562, 567 (1985), and was rejected.

[12]   In his next assignment of error, defendant argues that the trial court violated his federal and state due process rights in not enforcing a plea bargain agreement allegedly entered into by defendant and the State and that defendant was prejudiced by this violation. The record reveals that negotiations between defendant and the State resulted in an offer for defendant to plead guilty to two counts of second-degree murder and receive two, consecutive fifty-year sentences. On 14 June 1986, defendant agreed to this proposal. Within a week, defense counsel communicated the agreement to the prosecutor, who then revealed the necessity of defend-

ant settling a separate civil lawsuit involving defendant and the family of the victims. Defendant orally accepted the proposal, and sometime thereafter the prosecutor withdrew it. Defendant alleges that in the interim he relied upon the agreement to his detriment by suspending trial preparations, including the investigation and development of a potential insanity defense.

The trial court denied defendant's motion to enforce the plea bargain agreement and entered a lengthy order containing extensive findings of facts and conclusions of law. The court found as a matter of law "that there was not a meeting of the minds . . . and that there was not, therefore, a plea bargain agreement reached between the State of North Carolina and the defendant in these cases." The court also found that "even if a plea bargain agreement did exist between the State of North Carolina and the defendant in these cases as of June 20, 1986, that the defendant has not changed his position in detrimental reliance upon the agreement."

The law in this area was set out in *State v. Collins*, 300 N.C. 142, 265 S.E.2d 172 (1980), in which we considered the enforceability of a plea bargain agreement under similar circumstances. The defendant in *Collins* entered into a written plea bargain agreement with the State, which the State subsequently refused to honor. The trial judge denied defendant's motion to enforce the agreement. *Id.* at 143-44, 265 S.E.2d at 173. We examined recent federal constitutional cases in this area, most notably *Santobello v. New York*, 404 U.S. 257, 30 L. Ed. 2d 427 (1971), and *Cooper v. United States*, 594 F.2d 12 (4th Cir. 1979), and concluded that the trial court did not commit constitutional error in refusing to enforce the plea bargain agreement. In *Collins*, we stated:

> We therefore hold that there is no absolute right to have a guilty plea accepted. The State may withdraw from a plea bargain arrangement at any time prior to, but not after, the actual entry of the guilty plea by defendant or any other change of position by him constituting detrimental reliance upon the arrangement.

300 N.C. at 148, 265 S.E.2d at 176. Because defendant had neither entered a guilty plea nor in any way relied on the agreement to his detriment, the *Collins* Court denied defendant's appeal.

STATE v. HUDSON

[331 N.C. 122 (1992)]

As a state constitutional matter, the *Collins* Court concluded that the existence of N.C.G.S. § 15A-1023(b) provided even greater support for the State's position, and distinguished *Collins* from *Cooper v. United States*, 594 F.2d 12. N.C.G.S. § 15A-1023(b) provides that a plea bargain agreement proposed by the State that involves a recommended sentence must first be approved by the trial court before it can become effective. "Such a lack of judicial approval when required by statute renders the proposed plea bargain agreement null and void." *Collins*, 300 N.C. at 149, 265 S.E.2d at 176. "[T]he prosecutor ha[s] no authority to bind the State to the dispensation of a particular sentence in defendant's case until the trial judge ha[s] approved of the proposed sentence." *Id.* at 150, 265 S.E.2d at 176-77.

The issue was revisited recently by the federal courts in *Mabry v. Johnson*, 467 U.S. 504, 81 L. Ed. 2d 437 (1984). There, the Supreme Court noted that "[a] plea bargain standing alone is without constitutional significance; in itself it is a mere executory agreement which, until embodied in the judgment of a court, does not deprive an accused of liberty or any other constitutionally protected interest." *Id.* at 507, 81 L. Ed. 2d at 442. "[T]here is a critical difference between an entitlement and a mere hope or expectation that the trial court will follow the prosecutor's recommendation." *Id.* at 507 n.5, 81 L. Ed. 2d at 442 n.5.

Because defendant did not enter a guilty plea pursuant to the purported agreement, whether defendant's federal due process rights were violated turns on whether the facts reveal that defendant relied to his detriment on the agreement. We agree with the trial court's conclusion that no such reliance is evident.

Indeed, acceptance of the purported plea bargain agreement was communicated on 20 June 1986. On 1 August 1986, the State officially withdrew the agreement by means of a letter; the trial commenced 9 February 1987. The defense contends that it ceased pursuit of its case until December 1986, attributing the six-month lapse to the State's reneging on the agreement. We disagree. As noted by the *Collins* Court, a plea bargain agreement involving a sentence recommendation by the State must first have judicial approval pursuant to N.C.G.S. § 15A-1023(b) before it is enforceable; it is merely an executory agreement until approved by the court. The alleged plea bargain agreement here involved a sentence recommendation, namely, that defendant plead guilty to two counts of

**STATE v. HUDSON**

[331 N.C. 122 (1992)]

second-degree murder and receive two, consecutive fifty-year sentences. Thus, the understanding between defendant and the State, if any, not having been approved by the trial judge, was merely executory and of no effect as a matter of law. Any reliance by defendant, therefore, was not reasonable. Defendant's assertions of detriment here are decidedly nonspecific and are rendered doubtful in the face of the extensive psychiatric testimony actually mounted at trial. Moreover, the trial judge found that defendant had not changed his position in detrimental reliance upon the agreement.

Defendant's claim is similarly unavailing on state constitutional grounds. Given the absence of judicial approval pursuant to N.C.G.S. § 15A-1023(b), the agreement was of no effect. Because judicial approval did not occur, we reject defendant's state constitutional claim.

[13] Defendant's next basis for appeal concerns the testimony, over defense objection, of an emergency room physician, Dr. Mayer, that defendant did not appear psychotic during an emergency room visit two weeks prior to the killings in the instant case. The trial court agreed that Mayer was not qualified as an expert, and therefore no opinion testimony was allowable. However, the court ruled that Mayer could be asked about matters related to his more general practice and medical education. The transcript reveals the following cross-examination of Mayer by the State:

BY MR. GOODMAN:

Q Dr. Mayer, during your years of medical experience, and particularly as an emergency physician, have you had an opportunity to observe and see individuals in a psychotic situation, or who were psychotic?

A Yes, I have.

Q All right. Based upon your medical training and knowledge and experience, what are, and can you describe the general symptoms of somebody in a psychotic state, due to an emotional situation?

A Okay. First of all, I'm not a psychiatrist or a psychologist.

MR. MANNING: We'd object then.

THE COURT: Well, overruled, if he knows.

A But from my perspective, when I see a patient, if they break from reality and cannot function in reality any longer, they've entered a psychotic state.

Q What are the physical symptoms, if you will, that you've observed in persons in a psychotic state?

A Most of them were emotional symptoms of how to respond to me, if they're hallucinating, if they're not answering questions appropriately, if they're looking off into the distance while I'm talking to them and not acting appropriately, those are things I look for in the psychotic patients that I see.

Q Now, did you observe any of those symptoms that you've enunciated, or any of the other symptoms that you have previously observed in ·a person in a psychotic state in Dr. Hudson on March 10, 1986?

MR. O'DONNELL: Object to the form of the question.

A No, I did not.

THE COURT: Overruled.

Defendant contends that the trial court acted improperly in overruling defendant's objection to the State's cross-examination of Mayer as to defendant's mental state at the time of his emergency room visit. Defendant argues that merely because the questions were artfully crafted so as not to require a response prefaced by "In my opinion," the statements made by Mayer nonetheless amounted to unwarranted opinion testimony. Accordingly, the trial court erred in holding that Mayer could not offer an opinion but could draw inferences based in part upon his general expertise. Defendant argues that this action by the court violated our prohibition of expert testimony by nonqualified witnesses. *State v. Satterfield*, 300 N.C. 621, 628, 268 S.E.2d 510, 515 (1980). Moreover, defendant contends, this is not an instance where the trial court implicitly found that the witness was an expert. *See Apex Tire & Rubber Co. v. Tire Co.*, 270 N.C. 50, 153 S.E.2d 737 (1967). Here, the trial court expressly concluded that Dr. Mayer had not been qualified as an expert. Moreover, defendant contends that the testimony prejudiced him because of the conclusory nature of Mayer's testimony and the fact that the emergency room visit occurred only two weeks prior to the killings.

Assuming *arguendo* that it was error to admit Dr. Mayer's testimony in this regard, the trial court's action here did not amount to prejudicial error because defendant waived any objection that he may have had. The transcript reveals that subsequent to the testimony objected to by defendant as described above, defense counsel engaged in the following colloquy with Dr. Mayer on redirect:

Q Dr. Mayer, your testimony was that you didn't feel that Dr. Hudson was psychotic when you saw him; isn't that correct?

A That's correct.

Q You felt, I think, that he was having a situational reaction?

A That's correct.

Later, on recross-examination, the prosecutor asked the following question, not objected to by defendant:

Q I'm asking, the symptoms that you observed in Dr. Hudson on March 10th were any of those symptoms consistent with your observations of a person in a psychotic state?

A No they were not.

In *State v. Campbell*, 296 N.C. 394, 399, 250 S.E.2d 228, 231 (1979), we stated: "It is well established that the admission of evidence without objection waives prior or subsequent objection to the admission of evidence of a similar character." Because defendant waived his prior objection this assignment is overruled.

[14] Next, defendant contends that the trial court erred in overruling defendant's repeated objections to references made by the State during the cross-examination of defendant regarding his sexual proclivities. This examination included references to written communications defendant had with other married couples and with women other than his wife regarding sexual activity. Defendant concedes that objections were not lodged against all such inquiries and argues that the references nevertheless amounted to "plain error." Defendant argues that the cross-examination had no relevance to any material fact and had no probative value with respect to impeaching defendant's veracity.

During the presentation of the State's case-in-chief, Detective Brady of the Greensboro Police Department testified. On cross-examination by the defense, Brady was requested to read into

the record a statement given by defendant on the night of the killings. This statement was as follows:

"On approximately six or seven different times, I had affairs with different women, but [Kathryn] probably knew about only three of them. But I had terminated all of this behavior since August 1985. But about three or four weeks ago, [Kathryn] had found some letters in my briefcase that I had written to some women. One of the letters was current, and the other one went further back than a year or more. My affairs were also with out-of-town women, as I never saw any women here in Greensboro, due to my position here in the community.

"At one point in our marriage, I suggested that we go to a nudist colony, but [Kathryn] didn't want any part of it. She finally just told me to do my thing, but don't bring home any pregnant women or diseases. As far as I am aware, [Kathryn] never had any affairs with anyone.["]

Further, direct examination of defendant resulted in the following exchange between defendant and his counsel:

Q What was under the bed in your and [Kathryn's] bedroom at your house?

A What was under there?

Q Yes.

A My guns.

Q And what else?

A Some adult magazine, correspondences, things that [Kathryn] and I had shared between '79 and about '82.

Q And was some of that material pornographic?

A Yes.

Q Why did you have it there?

A We were a very erotic couple. It was something we were involved with for a short while together, and then later, I was involved with to a minor degree for a couple or three years. It had been under the bed, most of it, for three or

four years, without us even looking at it, except maybe at night, sharing a laugh, looking at it, that type of thing.

On numerous occasions, we have considered the propriety of efforts to elicit testimony from witnesses regarding their sexual behavior. In *State v. Scott*, 318 N.C. 237, 243, 347 S.E.2d 414, 418 (1986), we stated that such a cross-examination was improper because "instances of sexual relations or proclivities[ ] fall[ ] outside the bounds of admissibility under Rule 608(b)." Indeed, such extrinsic evidence rarely will be probative of a witness' character for truthfulness, as is required by Rule 608(b). *See* N.C.G.S. § 8C-1, Rule 608(b) (1988).

The State first contends that the cross-examination references to defendant's extramarital affairs and other sexual behavior were directed toward contesting defendant's assertion in the statement provided to Detective Brady that defendant had terminated such activities in August 1985. Moreover, the State argues that defendant opened the door to the references to illicit sexual activity by means of the above-described direct examination of defendant by defense counsel and the admission of defendant's statement during cross-examination of Detective Brady. Finally, the State argues that the alleged error does not reach the level of plain error. The defendant never denied killing his wife and daughter; his sole defense was that he did so while legally insane. Once the jury rejected the insanity defense, the evidence of guilt was unequivocal.

A review of the record reveals that defendant, early on in the cross-examination, conceded that after 1985 he corresponded with other adults about sexual matters and possible physical encounters but that he did not consider such activities to be "affairs." Therefore, his statement to Detective Brady that he ceased encounters of a physical nature, "affairs," was truthful. The record also reveals that none of the State's references to the illicit activities concerned actual physical contact between defendant and others. On this basis, the State's continued references to the defendant's purported nonphysical activities with adults were improper.

We agree with the State, however, that defendant opened the door to the cross-examination of defendant regarding his various and extensive illicit activities during the course of his marriage to Kathryn Hudson. In *State v. Albert*, 303 N.C. 173, 277 S.E.2d 439 (1981), we related the following principle:

[T]he law wisely permits evidence not otherwise admissible to be offered to explain or rebut evidence elicited by the defendant himself. Where one party introduces evidence as to a particular fact or transaction, the other party is entitled to introduce evidence in explanation or rebuttal thereof, even though such latter evidence would be incompetent or irrelevant had it been offered initially.

*Id.* at 177, 277 S.E.2d at 441. Here, defendant conceded on direct examination that he and his wife were a "very erotic couple." Further, defendant's statement to Detective Brady, read into evidence at the initiative of defendant, alluded to numerous extramarital affairs. Thus, seen in context, the State's inquiries regarding defendant's sexual proclivities were not impermissible. We therefore deem this assignment of error to be without merit.

Defendant next objects to the fifty-year sentence he received for the second-degree murder of Kathryn Hudson, claiming that the sentence impermissibly exceeded the presumptive sentence of fifteen years. The sentence, in part, was based upon two aggravating factors: that the offense was especially heinous, atrocious, or cruel and that defendant committed perjury during the trial. Defendant notes that when a sentencing court relies on an aggravating factor lacking in either evidentiary or legal support, the matter must be remanded for a new sentencing hearing. *State v. Ahearn,* 307 N.C. 584, 300 S.E.2d 689 (1983).

[15] Defendant contends that there existed insufficient evidence to support a finding that the killing of Kathryn Hudson was especially heinous, atrocious, or cruel. N.C.G.S. § 15A-1340.4(a)(1)(f) (1991). In examining whether the evidence supports this aggravating factor, "the focus should be on whether the facts of the case disclosed *excessive* brutality, or physical pain, psychological suffering, or dehumanizing aspects *not normally present in that offense.*" *State v. Blackwelder,* 309 N.C. 410, 414, 306 S.E.2d 783, 786 (1983). It is not "inappropriate in any case to measure the brutality of the crime by the extent of the physical mutilation of the body of the deceased or surviving victim." *Id.* at 415, 306 S.E.2d at 787.

In *State v. Benbow,* 309 N.C. 538, 308 S.E.2d 647 (1983), defendant entered a plea of guilty to second-degree murder. The evidence disclosed that the victim was beaten with a stick, fracturing his skull in several places and driving the orb of one eye into the

brain. We held that the evidence supported the finding that the crime was especially heinous, atrocious, or cruel.

As in *Benbow*, we find support for the finding here. The autopsy of Kathryn Hudson revealed that in her killing, apparently carried out with a butcher knife, the brutality was excessive and the injuries severe. The victim sustained numerous blunt trauma injuries to the forehead, nose, eye, and cheek areas. There also was a stab wound to the right side of the neck, and at least three severe incise wounds, one extending eleven inches, running from the left side of her neck through the right side to a midpoint on the back of the neck. This massive incision damaged the right and left carotid arteries and right and left jugular veins and was so deep as to damage the spine. According to the medical examiner, defendant used substantial force as he slashed his victim more than three times with the murder weapon. The autopsy revealed that the victim died as a result of the loss of blood and possibly interference with the oxygen supply to the body because of severance of the windpipe. Moreover, the evidence at trial indicated that as life was ebbing from the victim, Kathryn Hudson, three-year old Wilma Dale, defendant's second murder victim, watched and cried uncontrollably. Under the circumstances, extreme psychological suffering and torment in both the mother and child would be natural. We conclude that there was ample evidence to support the trial court's finding that the murder, which involved repeated stabbings resulting in severe and massive incised wounds and considerable loss of blood, was especially heinous, atrocious, or cruel.

[16] The trial court also found that Kathryn Hudson's killing was aggravated by the fact that defendant perjured himself during his trial. In *State v. Thompson*, 310 N.C. 209, 311 S.E.2d 866 (1984), we expressed significant reservations about the use of perjury as a nonstatutory aggravating factor, saying a "trial judge should exercise extreme caution in this area and should refrain from finding perjury as an aggravating factor except *in the most extreme case.*" *Id.* at 227, 311 S.E.2d at 876 (emphasis added). Four years later, in *State v. Vandiver*, 321 N.C. 570, 574, 364 S.E.2d 373, 375 (1988), we reexamined our position in *Thompson* and held that a finding of perjury constituted an impermissible aggravating factor and could not, as a matter of law, be considered in the sentencing decision. Significantly, however, we stated that the rule would be effective only as to sentencing proceedings commencing on or after the certification date of the *Vandiver* opinion, which was 23 February

1988. Here, defendant was sentenced approximately ten months prior to the certification date of *Vandiver*, thereby rendering the court's application of the factor permissible here.

[17]  We conclude that the "extreme case" standard enunciated in *Thompson* is satisfied here. The record reveals numerous significant contradictions between the testimony of defendant and the record, and the trial court's finding of perjury is supported by a preponderance of the evidence. *State v. Ahearn*, 307 N.C. 584, 596, 300 S.E.2d 689, 696-97.

First, defendant testified at trial that on the day before the murder, he grazed himself with a bullet while trying to commit suicide while seated in his car with a .38-caliber revolver. However, when Dr. James Kindl examined defendant on the day of the murders, he discovered no such graze mark. Moreover, when the revolver was recovered from defendant's car by the police, the revolver was fully loaded. Also, the police discovered no bullet holes within the vehicle. Altogether, the record reveals that defendant perjured himself on the basis of his assertion that he attempted to commit suicide the day prior to the killings.

Second, the record belies defendant's assertion that Kathryn Hudson attacked defendant with a butcher knife prior to the murders and that the attack accounted for a number of injuries defendant complained of during his examination by Dr. Kindl on the day of the murders. None of the clothing defendant wore at the time of the killings revealed any cuts or slashes naturally attending an attack with a butcher knife. Further, in confiding with jailmate Roger McQueen, his ersatz legal advisor, defendant never mentioned anything about his wife attacking him with a butcher knife.

Third, defendant testified on cross-examination that his knowledge of this State's law relating to the insanity defense was limited to what he was told by his counsel. This contention is belied by testimony by Roger McQueen that indicated that defendant did a substantial amount of research in this area while being held as a safekeeper.

Finally, defendant testified that after he was attacked by Kathryn Hudson with a butcher knife, he remembered nothing else until he was at the sink washing his hands. This testimony was decisively contradicted by the record, which reveals that at least fifteen minutes passed between the killings of the mother

and daughter and that defendant admitted that he killed Wilma Dale to "make it fit."

Taken together, defendant's false assertions under oath amply support the nonstatutory aggravating factor that defendant perjured himself during his trial. Unlike *Vandiver*, where the trial court supported its finding of perjury only on the basis of the jury's guilty verdict, 321 N.C. at 574, 364 S.E.2d at 375, here ample evidence exists of perjury. In sum, we conclude that the trial court did not err in employing perjury as a nonstatutory aggravating factor.

[18] Nevertheless, defendant argues that failure to apply the *Vandiver* rule retroactively constitutes a violation of defendant's federal and state due process rights. Support for defendant's view is found in the recent Supreme Court case of *Griffith v. Kentucky*, 479 U.S. 314, 328, 93 L. Ed. 2d 649, 661 (1987), where the Court provided that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final." Here, because defendant's appeal was pending before this Court at the time *Vandiver* was certified, defendant argues that the *Vandiver* rule should be applied retroactively.

An examination of *Griffith* and the long series of contradictory cases regarding retroactivity culminating with *Griffith*, however, reveals that the *Vandiver* rule need not be applied retroactively. Significantly, *Griffith* and the cases preceding it concerned the announcement of new rules concerning *constitutional* rights of the accused. *See, e.g., Griffith*, 479 U.S. 314, 93 L. Ed. 2d 649 (Equal Protection Clause and *Batson*); *Allen v. Hardy*, 478 U.S. 255, 92 L. Ed. 2d 199 (1986) (Equal Protection Clause and *Batson*); *Shea v. Louisiana*, 470 U.S. 51, 84 L. Ed. 2d 38 (1985) (Fifth Amendment and *Edwards*); *United States v. Johnson*, 457 U.S. 537, 73 L. Ed. 2d 202 (1982) (Fourth Amendment and *Payne*); *Linkletter v. Walker*, 381 U.S. 618, 14 L. Ed. 2d 601 (1965) (Fourth Amendment and *Mapp*). This distinction was expressly related in *Griffith*, where the Court provided: "[F]ailure to apply a newly declared *constitutional rule* to criminal cases pending on direct review violates basic norms of constitutional adjudication." *Griffith*, 479 U.S. at 322, 93 L. Ed. 2d at 658 (emphasis added).

The "new rule" before the Court in the instant case is not of constitutional magnitude. It is clear that the discouragement of the use of the aggravator stems from practical concerns over

its application, rather than any abiding concern for the constitutional rights of defendants as was the case in *Griffith,* and was prescribed by this Court pursuant to its powers to prescribe rules of practice and procedure under N.C.G.S. § 7A-34 and Article IV, Section 13 of the North Carolina Constitution. According to the *Vandiver* Court, the use of perjury as an aggravating factor was precluded because:

> The "extreme case" standard has proved unworkable and our words of caution insufficient bulwarks against misuse of the aggravating factor. . . .
>
> Because a trial judge's determination of the factor is basically dependent upon his subjective evaluation of the defendant's demeanor, we find it impossible to formulate adequately concrete guidelines to prevent future erroneous findings. In the interests of justice, we therefore hold that perjury may no longer constitute a nonstatutory aggravating factor in North Carolina.

*Vandiver,* 321 N.C. at 573-74, 364 S.E.2d at 375. For this reason, we reaffirm our statement in *Vandiver* that the *Vandiver* rule is not to apply retroactively.

[19] Finally, defendant assigns error to the trial court's refusal to find the statutory mitigating factor that "the relationship between the defendant and the victim was . . . extenuating." N.C.G.S. § 15A-1340.4(a)(2)(i) (Supp. 1991). Defendant argues that the uncontroverted evidence adduced at trial established that such a relationship existed between him and his wife and that therefore the matter must be remanded for a new sentencing hearing. *State v. Jones,* 309 N.C. 214, 306 S.E.2d 451 (1983). We disagree.

In *State v. Watson,* 311 N.C. 252, 257, 316 S.E.2d 293, 297 (1984), we responded to a similar claim as follows: "We decline to hold . . . that a relationship between husband and wife, including marital difficulties in the past, is sufficient, standing alone, to support a finding of this mitigating factor." We reach the identical conclusion here.

In conclusion, we hold that defendant received a fair trial free of prejudicial error.

No error.

Justice WEBB concurring.

I concur with the result reached by the majority but not with all its reasoning.

The majority says that it was harmless error to admit Dr. Mayer's testimony that the defendant did not exhibit the symptoms of a person in a psychotic state. I would hold it was not error to admit this testimony. A witness may testify as to the mental condition or capacity of a person if he has had a chance to observe that person although the witness is not an expert in mental disorders. *See* 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 127 (3d ed. 1988).